### The E. A. Packer.

### New Jersey Lighterage Co. *v.* The E. A. Packer.

*(Circuit Court, S. D. New York.   January 8, 1892.)*

**Collision—Tugs with Tows—Error in Extremis—Findings of Facts.**

The tug W. was towing a barge by a hawser from Roberts' store, on East river, to Jersey City, going with the tide about seven miles an hour. The tug P., with a tow lashed on her port side, projecting beyond the bow of the tug, rounded the Battery, from the North river into the East river, going about two miles an hour. The vessels discovered each other when about 500 yards apart, on crossing courses, the P. having the W. on her starboard bow. The P. immediately blew two whistles to indicate that she desired to pass to port and across the bows of the W. The W. made no reply, but kept on her course, without abating speed, until within about 200 feet of the P. The P. then reversed her engines and came to a stand-still, being then almost directly in the path of the W., but somewhat on her port bow; and the W. ported her wheel, thereby changing her course to starboard four or five points. The W. escaped collision with the P., but her tow struck the bow of the P.'s tow. In a suit brought by the owners of the tow of the W. against the P., *held:* (1) If the P. was in fault the libelant should recover, even though the W. had also been in fault. (2) That, inasmuch as the P. had the W. on her starboard bow when the vessels discovered each other, it was the duty of the P. to avoid the W. and her tow, and the duty of the W. to keep her course; and that, there being no special circumstances rendering a departure necessary from the ordinary rules at the time when the vessels were 500 yards apart, the P. was in fault for attempting to cross the bows of the W., it being apparent that doing so was likely to involve risk of collision. (3) If it was an error for the W. to port at the time she did, instead of reversing her engines, the error was committed under stress of a sudden peril brought about by the original fault of the P., and the P. should be held altogether responsible for the collision. (4) The supreme court having reversed the former decree of this court because of a refusal of the judge to find a certain fact as requested by the defeated party, this court now makes a finding upon the fact, although it is not necessary to do so since the act of March 3, 1891, establishing the circuit courts of appeals.

In Admiralty. Libel for collision. Decree for libelant.

This was a suit in admiralty, instituted by the New Jersey Lighterage Company, owner of the barge Atlanta, against the steam-tug Dr. John Wolverton, which had the Atlanta in tow, and also against the steam-tug E. A. Packer, to recover damages for a collision between the Atlanta and a barge lashed along-side and in tow of the Packer on her port side, known as "Cross Creek Barge No. 5," which occurred in the afternoon of October 25, 1880, near the mouth of the East river, in the harbor of New York. Service never having been obtained upon the Wolverton, the case proceeded against the Packer, and in the district court a decree was granted dismissing the libel upon the ground that the Wolverton was solely at fault for the collision. 20 Fed. Rep. 327. Upon appeal to the circuit court, this decree was reversed upon the ground that the collision was partly, at least, the fault of the Packer, and that, under the rulings of this court, the libelant was entitled to recover its entire damage against her, which amounted, with interest, to $5,404.31, for which a decree was rendered against her. On appeal to the supreme court, this decree was reversed, (11 Sup. Ct. Rep. 794,) mainly upon the ground of a refusal of the circuit court to make a finding in regard to a certain matter of fact. The findings made by the circuit court were as follows:

"*First.* That on the 25th day of October, 1880, the libelant was the owner of the barge Atlanta, and was a common carrier of a cargo on said barge, as alleged in the libel. *Second.* That on that day, in the afternoon, a collision occurred between said barge and the barge Cross Creek No. 5, then in tow of the steam-tug Packer. *Third.* That the barge Atlanta and her cargo were on that day taken in tow by the steam-tug Wolverton at Roberts' stores, in the East river, to be towed to the Long dock, Jersey City, and were towed astern of said tug by a hawser of one hundred and fifty feet in length between the tug and barge. *Fourth.* That on that day the tug Packer was bound from the North river into the East river, having in tow on her port side the barge Cross Creek No. 5, loaded with about 450 tons of coal, the barge projecting beyond the bow of the tug. *Fifth.* As the Wolverton, with her tow, was crossing the mouth of the East river, the Packer, with her tow, was heading around the Battery into the East river, passing the New York shore opposite the barge office, nearly two hundred yards away. *Sixth.* That the tide in the East river was ebb, and at about full strength. The Wolverton and her tow were going with the tide about seven miles an hour, and the Packer and her tow were proceeding against the tide at a speed of about two miles an hour. *Seventh.* That the Packer and her tow had come so far around from the North river before seeing the Wolverton as to be in the ebb-tide coming out of the East river, and when she saw she was heading up against that tide, and was about 200 yards out from the shore opposite the barge office. *Eighth.* The vessels saw each other when about 500 yards apart, and at that time the course of the Wolverton was about N. W. by N., and the course of the Packer was E. by N., and as they approached each other the Packer had the Wolverton on her starboard bow, and the Wolverton had the Packer on her port bow, the Wolverton being further out in the river from the New York shore than the Packer, and the vessels being upon crossing courses, converging towards the New York shore. *Ninth.* As soon as the Packer saw the Wolverton she blew two blasts of her steam-whistle. She was then under a starboard wheel, and making in somewhat towards the end of the piers, but upon signaling the Wolverton she starboarded the wheel still more. The

Wolverton made no reply to the Packer's signals, but kept on her course, without abating speed, until within about 200 feet. The Packer then blew two more whistles, and reversed her engines, and the Wolverton ported her wheel. The Wolverton passed the bow of the Packer and her tow, but the libelant's barge was unable to do so, and her port side came into collision with the bow of the Packer's tow. *Tenth.* At the time the Wolverton ported her wheel danger of collision was imminent, and a collision seemed unavoidable. *Eleventh.* There was nothing in the river to interfere with the navigation of either vessel. The collision occurred about 400 or 500 feet off the ends of the piers, and just below the slip of the South ferry. *Twelfth.* There was no local usage of navigation applicable to the situation of the vessels when they discovered each other. *Thirteenth.* That between the tide of the East river and the North river there is an eddy, which extends out about 400 feet from the barge office, and the Packer had passed through this eddy and reached the ebb-tide, which struck on the port bow of her tow, and swung the vessels still further off shore before her pilot saw the Wolverton. *Fourteenth.* The libelant's barge was in all respects properly navigated. By reason of the collision the barge and cargo sustained serious injury."

The following conclusions of law are found:

"*First.* The two tugs being on crossing courses, it was the duty of the Packer, having the Wolverton on her starboard hand, to keep out of the way, and the duty of the Wolverton to keep her course. *Second.* It was the duty of the Packer to port her wheel, and stop and reverse her engine in time to avoid the collision. *Third.* The libelant is entitled to recover against the Packer the damages sustained by the collision."

The course of the Wolverton, as stated in the eighth finding, was subsequently changed by the circuit judge from N. W. by N. to W. N. W.

*Benedict, Taft & Benedict,* for libelant.

*Edw. D. McCarthy,* for claimant of the E. A. Packer.

WALLACE, Circuit Judge. The decree formerly made in this case, adjudging the libelant entitled to recover against the Packer for the damages sustained by the collision between the libelant's barge Atlanta and the barge in tow of the Packer, having been reversed by the supreme court upon appeal, because this court refused to make a finding of fact which that court, upon the evidence before it, thought the appellant entitled to, the case is now here for a redetermination. Nothing was decided by the supreme court authoritatively, except that, upon the evidence before it, the appellant, the owner of the Packer, was entitled to the finding of fact which he had requested. The facts in the case substantially appear in the statement preceding the opinion of the supreme court.[1] *The E. A. Packer,* 140 U. S. 360, 11 Sup. Ct. Rep. 794. Inasmuch as upon any further review there will be no bill of exceptions, and there is no necessity for any findings of fact by this court, it would seem unnecessary to make the finding which was the subject of the exception upon which the former decree was reversed. Nevertheless, in view of the opinion of the supreme court, it has seemed to me the more proper course to reconsider the evidence, much of which was not embodied in the record on the

[1] The statement preceding this opinion is substantially copied from that of the supreme court.

appeal, with a view of making or refusing to make the finding. In doing this the entire evidence in the case has necessarily been re-examined and reconsidered. I have reached the conclusion, reached before, that the libelant is entitled to a decree against the Packer. I have little to add to my former opinion filed when the cause was originally decided; but it may assist the circuit court of appeals, in case of an appeal from the present decision to that tribunal, to refer to some of the evidence bearing upon the questions of fact and to some additional reasons for my conclusions of law.

The master of the Packer testified originally that the collision took place from 150 to 200 yards off the New York side of the river. This statement is in harmony with the facts set forth in the answer of the Packer. If she was 200 yards off while rounding the Battery, she could not have approached, under the helm she carried, and with the ebb-tide on the port bow of her tow, much nearer than this distance up to the time of the collision. Without referring to other testimony and corroborating circumstances, the place of collision would seem to be correctly located where it was placed in the original findings. It will be observed that, according to the theory of the Packer's answer, there was not any rank change of course made by the Wolverton after the Packer discovered her. Its theory is that the Packer was entitled, because of the situation of the vessels when they first saw each other, to go between the Wolverton and the New York shore. It avers that when she first saw the Wolverton it would have been impossible to clear the Atlanta by going off on a port wheel, and that any movement to the right would have rendered a collision with the Wolverton inevitable. It assumes that the Atlanta was in fault for the collision because she did not follow the Wolverton directly, and it distinctly charges fault in this respect upon the Atlanta; while, in enumerating the faults of the Wolverton, it does not charge any fault upon her because of any change of course on her part. The testimony of Barker, and of Ackerley, each of whom was at the wheel of the Atlanta, indicates that there was no change of course on the part of the Wolverton until collision seemed imminent. These, among other considerations, have led me to the conclusion that there was no change of course on the part of the Wolverton, until, as her master testifies, he ported to avoid destruction when the tugs were within 200 feet of each other. The vessels were not sailing by compass. I have accepted the testimony of Frazer, who was in the pilot-house of the Wolverton, and who seems to be an intelligent and trustworthy witness, as the most reliable by which to ascertain the course of the Wolverton. He says that after she got out from Roberts' stores she headed for about pier 5, on the New York side, and was making allowance for the ebb-tide to carry her opposite pier 1 or 2, when she should reach the New York shore, intending to get in there as close as she could. The testimony of this witness also shows, as does that of the pilot in charge of the Packer, that the Atlanta sagged a little with the tide below the course of the Wolverton, but that she did not sag so much that the Wolverton

could not, while going at the speed she maintained, manage her in a way consistent with her safety or that of other vessels.

The testimony of the various witnesses is practically in accord, making due allowance for the discrepancies which always occur upon such a question, that the tugs were about 500 yards apart when they discovered each the other. I have accepted as substantially correct the statement of Adams, the engineer of the Wolverton, who locates the Wolverton at a distance of 300 or 400 yards off the New York shore when the Packer was 400 or 500 yards away, and who locates the Packer at that time a little on the port bow of the Wolverton. The weight of testimony is, decidedly, that the Packer had the Wolverton on her starboard bow when she first discovered her; and, indeed, this is fairly inferable from the statements in the answer of the Packer. There is no evidence in the record, worthy of consideration, to denote that the Atlanta was improperly steered, or did not follow the Wolverton as closely as she could, in view of the action of the tide.

Upon the facts, as I have found them, it being entirely plain that the Atlanta was innocent of any fault, the libelant is entitled to compensation for the loss sustained by the collision, either from the Packer or from the Wolverton, or from both. If this were a suit between the two tugs, and cases could be decided upon sentimental considerations, the sympathies of the court would be wholly with the Packer. But the Wolverton is not in court, and the only question to be determined is whether the Packer was guilty of fault which was contributory to the collision. If she was, the libelant is entitled to a decree. It is obvious that the collision might have been easily avoided if the Wolverton had yielded her strict rights, and altered her course to port when informed by the signals of the Packer that the latter proposed to pass across her bows by keeping to port. The Packer was in a very inconvenient situation, and naturally preferred keeping between the New York shore and the Wolverton, because by altering her course to starboard she would expose herself and her cumbersome tow broad-side to the full force of the tide. The Wolverton, however, wanted to get the benefit of the slack-water near the shore at the Battery, and refused to accede to the proposition of the Packer, although she could have done so with perfect safety, and without serious inconvenience to herself. But I cannot find upon the facts that the Packer could not have avoided the Atlanta as well as the Wolverton if she had taken a course to the starboard and astern of the vessels; and I agree with the learned district judge who decided this cause in the district court that she could have done so.

Inasmuch as when the vessels first saw each other, at a distance of about 500 yards away, the Packer had the Wolverton on her starboard hand, and the Wolverton had the Packer on her port bow, it was the duty of the Packer to avoid the Wolverton, and the correlative duty of Wolverton to keep her course. In that situation rule 2 of the supervising inspectors, then, as now, in force, required the Packer to fulfill her duty of avoiding the Wolverton by passing to the right of the latter, and

required the Wolverton to pass to the right of the Packer. It is unnecessary to decide whether this regulation is one which has the force of a statutory rule, or whether it is one in excess of the authority which is conferred by law upon the supervising inspectors. It suffices that the rule, at least as to the duty of the Packer under the circumstances of the present case, formulates the practice which is approved by the best nautical experience, and which has been adopted as an imperative regulation by the international marine conference. The language of the supreme court, when this cause was before it, proves that the Packer was in fault in taking a course to port:

"If it were clear that no collision would have occurred had the Wolverton kept her course, then the starboarding of the Packer was not a fault, since the point of intersection would be ahead of or astern of the Packer. But if such starboarding was likely to involve risk of collision, then, of course, it was a fault."

That the starboarding of the Packer did in this case involve risk of collision is demonstrated beyond peradventure or cavil by the fact that, before the Wolverton changed her course at all, the Packer saw that danger of collision was imminent, and that she could not pass ahead of the Wolverton, and reversed her engines.

I cannot see how the twenty-fourth rule of navigation has any application to the case. That rule authorizes a departure from the other rules when there are special circumstances rendering a departure necessary "in order to avoid immediate danger." There were no such circumstances when the vessels were 500 yards apart, and when the first fault of the Packer, if there was any, was committed. This was conceded in the opinion of the district judge. There was no immediate danger, and no condition in the situation which would have rendered it unsafe for her to have taken her course to starboard. It would have been inconvenient for the Packer to do so, but nothing more. If it was the duty of the Wolverton to alter her course to port when she heard, or ought to have heard, the first signal of the Packer, then it is clear the collision is attributable solely to her fault. That proposition has not been advanced by counsel for the Packer, and, notwithstanding some expressions in the opinion of the supreme court which may be interpreted as sanctioning it, I cannot believe that it was intended to be so declared. Unless one vessel has a right, merely at her option, and without regard to any special circumstances, to dictate to another vessel a departure from a rule which it is the right and the duty of the latter to observe, this proposition cannot be maintained.

It remains to be considered whether the collision is attributable to the conduct of the Wolverton, either because she did not reverse before the collision, or because she ported her helm. Upon this question that which seems to me the pregnant and controlling circumstance in the situation is not adverted to in the opinion of the supreme court. That circumstance is that while the Wolverton was fulfilling her duty of keeping her course, and relying upon the Packer to fulfill her duty of keeping out of the way in the manner she had selected, by passing in front

of the Wolverton, the Packer slowed and reversed her engines, and brought herself practically to a stand-still in the water. This was done when the tugs were within a distance of about 200 feet of one another. If the Packer had not thus brought herself to a stand-still when she was nearly in the path of the Wolverton, it is probable that the Wolverton would have passed astern; at least, it is possible that the Wolverton might have done so. Unless it can be found that the Wolverton could not have passed astern of the Packer had not the latter reversed, it cannot be adjudged that the collision is solely attributable to the conduct of the Wolverton in not reversing. The evidence does not warrant such a finding.

Was the Wolverton in fault for porting? It seems to have been assumed by the supreme court that she was, and that tribunal reversed the former decree of this court because of the refusal of this court to find, as the evidence before the supreme court denoted, that the course of the Wolverton was changed to starboard four or five points from her former course. In the opinion it is said "that the porting of the Wolverton must almost of necessity have brought about a collision." How this result could happen when the Packer was off the port bow of the Wolverton, and at a stand-still in the water, or nearly so, having abandoned her attempt to go forward in front of the Wolverton, I am at a loss to understand. It was for this reason, and because I deemed the finding immaterial, that I refused to find as requested. It seems to me that the more the Wolverton could have changed her course to the starboard the greater would have been the chance of safety to both vessels, because the greater the change of course the wider would have been the distance between them. If the Packer had maintained her speed, I am not satisfied that a change of course of four or five points to starboard on the part of the Wolverton would have enhanced the chances of a collision; but as it was, if it would have been safe for the Wolverton to proceed without altering her course, it certainly could not have been unsafe to alter it in a direction which would carry her a further distance away from the bows of the Packer than she would have otherwise gone. I have very great doubt whether it was possible for the Packer, in the short intervening distance between the intersecting courses of the two tugs, to change her course four or five points to starboard. Any such change is utterly inconsistent with the theory of the Packer's answer. Still, Shults, the master of the Wolverton, states that he effected such a change by porting, and, notwithstanding much in the testimony that leads me to a contrary opinion, I will find for present purposes that such a change was made. If it should be assumed that if the Wolverton had reversed, or had not ported, the collision might have been avoided, the question remains whether the Packer was not in fault for bringing the Wolverton into a situation where her master was liable to commit an error of judgment.

I understand the rule to be well established that in every case where a vessel, by her own negligence, or the breach of a statutory rule; places another in great peril, the latter will not be held guilty of negligence

because at the last moment she did something that contributed to the collision, or omitted to do something that might have avoided it. It has often been held by the supreme court that a vessel which by her own fault causes a sudden peril to another cannot impute to the other as a fault a measure taken *in extremis*, although it was a wrong step, and but for it the collision would not have occurred; and that a mistake made in the agony of the collision is regarded as an error for which the vessel causing the peril is altogether responsible. *The Nichols*, 7 Wall. 656; *The Carroll*, 8 Wall. 302; *The City of Paris*, 9 Wall. 634; *The Lucille*, 15 Wall. 676; *The Favorita*, 18 Wall. 598; *The Falcon*, 19 Wall. 75; *The Sea Gull*, 23 Wall. 165. If this is the correct rule, it would seem that if the Wolverton was in fault for not reversing, or for porting, or for not starboarding, it was a fault committed in the throes of a collision, which not only does not exonerate the Packer, but does not subject the Wolverton to liability. Whatever the conclusion may be as to fault on the part of the Wolverton, it suffices to establish the liability of the Packer to the libelant; that the Packer was guilty of fault which was contributory to the collision. She insisted upon adopting the most hazardous mode of fulfilling her duty of avoiding the Wolverton, and attempted to do it in a way which her own conduct conclusively shows was not practicable, except at risk of collision. A decree is ordered for the libelant.

