## THE PACIFIC.

### (Circuit Court of Appeals, Third Circuit. June 10, 1907.)

### No. 15.

**1. COLLISION—MOVING AND ANCHORED VESSELS—CONTRIBUTORY FAULT.**

Where a moving vessel was clearly in fault for a collision with one at anchor, the latter will not be held in fault because at the last moment she did something that contributed to the collision, or omitted to do something which might have avoided it.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Collision, § 227.]

**2. SAME—ACTS DONE IN EXTREMIS.**

A dredge which had been engaged for some months in dredging the channel of the Delaware river below Philadelphia, 90 feet to the westward and 175 feet to the eastward of the line of the Edgemoor range lights, at night moved to the eastward 350 feet from the range line and 175 feet outside of the dredged channel, where she anchored for the night, carrying proper anchor lights and with her bow down stream. On her west side lay a tug with the bow up stream. The anchor lines of the dredge extending to the westward were weighted and sunk, while two extending eastward were not. While in such position the large steamship Maling, coming down from Philadelphia and drawing more than 20 feet aft, after rounding the buoy 1½ miles above the dredge, took a course which would have carried her slightly to the eastward of the dredge. Seeing her approaching nearly head on, the watchman on the dredge seized a lantern, and waved it from east to west. The tug, also, as contended by the steamship, gave a signal of a single blast on which the steamship, when about five lengths distant, ported and attempted to go to the westward, but came into collision with the stern of the dredge. The Maling was clearly in fault for being not only on the wrong side of the channel, but entirely outside of and heading away from it. *Held*, that the dredge was not chargeable with contributory fault because of the position in which she was anchored, nor because her port lines were not weighted, since she was not in the fairway of the Maling, and owed her no duty with respect to the lines to the eastward, and neither act, therefore, was a contributory cause of the collision, nor was she in fault for the signal given by her watchman, which, if improper, was an act done in extremis when the dredge was in imminent danger of collision, or of having her lines cut by a vessel out of her proper course. *Held*, also, that the tug was not chargeable with fault because, as alleged, she was carrying sailing lights, nor because she gave alarm signals, neither of which contributed to the collision, but both of which were calculated to warn the Maling of her improper course, nor because of her passing signal, which, if given, was in extremis and in aid of the signals from the dredge.

Appeal from the District Court of the United States for the District of Delaware.

See 116 Fed. 107.

John F. Lewis and Francis C. Adler, for appellant.

J. Parker Kirlin, James J. Macklin, and Henry R. Edmunds, for appellee.

Before DALLAS and BUFFINGTON, Circuit Judges, and LANNING, District Judge.

LANNING, District Judge. This is a collision case. Three vessels are concerned in it—the dredge Pacific, the tug S. A. McCauley, and the steamship Maling. The collision resulted in damage to the

dredge amounting, with interest and costs, to the sum of $19,754.70. By the final decree of the District Court all three of the vessels were adjudged to have been in fault, and one-third of the damages was apportioned to each of them. The steamship abides by the decree, and has paid the one-third assessed against it. The tug and the dredge (with her insurers) have appealed, and by the errors assigned have presented questions concerning the negligence and contributory negligence of the several vessels.

The collision occurred in the Delaware river, below Philadelphia, on the night of November 16, 1897. The night was dark, but clear. The dredge was anchored in the easterly side of the river, bow down. The tug was tied to the westerly side of the dredge, bow up, her stern projecting some feet below the dredge's bow, and the dredge's stern projecting some feet above the tug's bow. The steamship, in passing down the river, struck the dredge and did the damage complained of. The dredge for some months had been engaged under employment of the United States government in dredging out the navigable channel of the river 90 feet on the westerly side and 175 feet on the easterly side of the line of the Edgemoor range lights. For some days previous to the collision the dredge had been working on the easterly side of this line. About 5 o'clock in the afternoon, just preceding the collision, she was removed to a point about 350 feet easterly of the line of the range lights, and there anchored for the night. Her anchor lines, extending to the west, toward and across the dredged channel, were weighted and submerged. Those extending to the east, away from the dredged channel, were not submerged. The dredge's lights indicated that she was at anchor. Whether the lights of the tug indicated that she was moving or at anchor is disputed. The steamship, in passing down the river, having rounded the Edgemoor buoy, which was 1 to 1½ miles above the dredge and tug, took a course by which the dredge's lights were kept slightly on the steamship's starboard bow, so that, if she had not subsequently changed her course, she would have passed, or attempted to pass, on the easterly side of the dredge. The nearer she approached the dredge, therefore, the further was she departing from the line of the range lights, by which alone she should have steered her course. It is admitted by her counsel that she was on the wrong side of the river. We are satisfied, too, that, if she had not subsequently changed her course, she would have fouled the dredge's port lines and incurred the risk of doing serious damage to the dredge. The evidence of the steamship's pilot shows that he thought the dredge was on or nearly on the line of the range lights, which were to his stern, and that, instead of guiding his course by those lights, he guided it by the lights of the dredge. The dredge had withdrawn from the ship channel for the express purpose of leaving the channel free and unobstructed during the night. It was the duty of the pilot of the steamship to keep to his starboard side of the channel. Instead of doing so, he not only passed over to his port side of the channel, but beyond it into the shallower water, where the dredge was anchored. He was in charge of a moving steamer which he had under full control. He was going down the river on an ebb tide running two or more miles an hour. While he says that after

rounding the Edgemoor buoy he reduced his speed, the master, who executed the pilot's orders, declares that until within about five ship lengths from the dredge the steamship was going at full speed. That the pilot was grossly negligent is perfectly clear, and, as above stated, the liability of the steamship for at least one-third of the damages has been admitted and the amount paid.

The question now to be decided is whether either the dredge or the tug is chargeable with contributory negligence. In The Oregon, 158 U. S. 186, 197, 204, 15 Sup. Ct. 804, 809 (39 L. Ed. 943), the court said:

"Where one vessel clearly shown to have been guilty of a fault adequate in itself to account for the collision seeks to impugn the management of the other vessel, there is a presumption in favor of the latter which can only be rebutted by clear proof of a contributing fault. This principle is peculiarly applicable to the case of a vessel at anchor, since there is not only a presumption in her favor by the fact of her being at anchor, but a presumption of fault on the part of the other vessel which shifts the burden of proof upon the latter."

In that case the Clan Mackenzie was at anchor in the Columbia river outside of the usual track of steamships. Her lookout saw the Oregon bearing down on the Clan Mackenzie. The lookout hailed the Oregon, and continued to shout until just before the collision. Concerning the shouting, the court said:

"It was a case of action in extremis, and, while it is possible that a bell might have called the attention of the approaching steamer, it is by no means certain that it would have done so and, whether the lookout acted wisely or not, he evidently acted upon his best judgment, and the judgment of a competent sailor in extremis cannot be impugned. * * * As we have already observed, it is not sufficient for the Oregon to cast a doubt upon the management of the Clan Mackenzie. In view of the clearness of her own fault, it is not unreasonable to require that she should make the fault of the other equally clear."

In The E. A. Packer (C. C.) 49 Fed. 92, 98, Judge Wallace said:

"I understand the rule to be well established that in every case where a vessel, by her own negligence, or the breach of a statutory rule, places another in great peril, the latter will not be held guilty of negligence because at the last moment she did something that contributed to the collision, or omitted to do something that might have avoided it. It has often been held by the Supreme Court that a vessel which by her own fault causes a sudden peril to another cannot impute to the other as a fault a measure taken in extremis, although it was a wrong step, and but for it the collision would not have occurred, and that a mistake made in the agony of the collision is regarded as an error for which the vessel causing the peril is altogether responsible."

Is the dredge chargeable with contributory negligence? The steamship contends that she was, first, because she did not sink her anchor lines extending to the eastward; second, because, it is alleged, she gave to the steamship an irregular and improper signal by the waving of a lantern; and, third, because, it is again alleged, she was improperly anchored in the fairway of the river. It is true that the dredge's port breast line and port quarter line were not weighted, and that they were obstructions to any vessel that should attempt to pass near to the dredge on her port or easterly side; but, if it be assumed that there was a duty on the part of the dredge toward smaller craft to sink those

lines, as she did the lines on her starboard or westerly side, the question here presented is: Did she owe any such duty to this particular steamship? It seems to us that the duty of the dredge to sink its port lines was a duty owing only to those vessels that might lawfully pass on the easterly side of the dredge. The persons in charge of the dredge were justified in assuming that a steamship such as the Maling, admittedly drawing over 20 feet of water, would steer her course by the range lights, and, when passing down the river, would keep to the westerly side of the dredge. Furthermore, the fact that the port lines were not weighted was not a proximate cause of the collision. The steamship did not run into them, nor was her course altered because of them. Her course was altered solely because of signals from the dredge or the tug, or both of them. The fact that, if the steamship should attempt to pass on the easterly side of the dredge, she would foul the dredge's lines, may have been, and doubtless was, the reason for the signal from the dredge for the steamship to pass on the westerly, and not on the easterly, side of the dredge. But just as in actionable so in contributory negligence the cause of the injury must be a proximate and not a remote cause. Here there was no proximate connection between the placing of the unweighted port lines of the dredge and the collision, for the reason that there was an intervening act on the part of the dredge, namely, a signal to the steamship to pass on the westerly side of the dredge, which the pilot of the steamship admits he attempted to obey. If the dredge was guilty of contributory negligence, it was because of the signal she gave to the steamship, and not because she failed to sink her port anchor lines.

Nor, in view of the condition which suddenly confronted the dredge, should she be held guilty of contributory negligence because of the signal given by her to the steamship. As already stated, she was anchored about 350 feet east of the line of the range lights. That was about 175 feet east of the easterly side of the dredged channel. At low tide she was in about 18 feet of water. This large steamship, 325 feet long and drawing 20 feet and 7 inches of water, was approaching the dredge nearly head on, having the dredge slightly on her starboard bow. She had no lawful right there. As against her, the persons in charge of the dredge had the right to assume that the dredge was in a place of perfect safety. Seeing there was imminent danger of a collision, or that the steamship would cut the dredge's port lines, the watchman of the dredge seized a lantern and violently waved it from east to west. At first the pilot of the steamship, evidently thinking he was on or nearly on the line of the range lights, and that there was safe passage for him to the east of the dredge, did not heed the signal. Presently, after having also received, as he says, a signal of one short blast from the tug, he obeyed the two signals, hard-ported his helm, and sought, too late, to clear the dredge by passing to the westerly side. The steamship complains that the waving of the lantern was not an authorized signal; but it was given to a moving steamer, out of her proper course, by an anchored vessel in imminent danger. The dredge might have shown a flare-up light or used a detonating signal, as authorized by article 12 of the act of August 19, 1890 (26 Stat. 325, c. 802 [U. S. Comp. St. 1901, p. 2867]) but she was not required to do so. In

the circumstances the signal given did not put the dredge in fault, and therefore did not render her chargeable with contributory negligence

The remaining ground on which the steamship charges the dredge with contributory negligence—that the dredge was improperly anchored in the fairway—is equally untenable. It must be borne in mind that contributory negligence is necessarily based on an act, or omission to do an act, which is a contributing proximate cause of the accident complained of. If the dredge had been anchored in that part of the river which the steamship had the right to use, the case would present a different aspect. But she was not so anchored. She had taken the precaution just before night to withdraw from the dredged channel to the eastward, and to a place clearly outside of the path within which the steamship should have held her course. Even though she may have been in the fairway of smaller craft, she was outside of the steamship's fairway, and by anchoring there she did not in anywise contribute to the particular accident which is the subject of our present inquiry. We conclude, therefore, that as between the dredge and the steamship the former vessel did not contribute to the injury she received.

The counsel for the steamship also contends that the tug was guilty of contributory negligence for these reasons: First, because she gave to the steamship, when the two vessels were but a short distance apart and when the steamship was still heading for the easterly side of the dredge, a single short blast; second, because the tug blew alarm signals; and, third, because the tug showed sailing lights, instead of anchor lights. There is no doubt that the tug did blow alarm signals after it became evident that there was imminent danger of a collision. They were given in extremis, and were fully justified by the conditions. Article 27 of the act of June 7, 1897 (30 Stat. 102, c. 4 [U. S. Comp. St. 1901, p. 2884]), which has been in force since 1884, expressly provides that in construing the rules of navigation in our rivers, harbors, and inland waters due regard shall be had to all dangers of collision and to any special circumstances which may render a departure from the rules necessary in order to avoid imminent danger. The alarm signals given by the tug were intended to notify the steamship of impending danger. The steamship's pilot recognized them as alarm signals. They were admittedly given after the steamship had ported her helm and changed her course. Consequently they did not in anywise contribute to the collision.

It is further urged on the part of the steamship that the tug displayed lights indicating that she was in motion and not at anchor, and that just before giving the alarm signals she gave one short blast of her whistle, thus indicating an intention of meeting the steamship port to port. The master of the tug denies having given such a signal, though several witnesses on the steamship testify that they heard it. We do not deem it necessary to attempt to analyze the contradictory statements of these witnesses. We may assume, for the purposes of this case, that the tug did first give a signal of one blast of its whistle, and that its lights were sailing, and not anchor, lights. It has already been observed that the watchman on the dredge was waving a lantern from east to west, and thereby signifying his desire to have the steamship port her helm, and pass to the west of the dredge. If

the tug had her sailing lights up and gave a signal of one blast, the steamship was thereby notified that the tug also desired her to port her helm and pass to the west. The signals on the dredge and tug were therefore harmonious. No confusion was created by them. Furthermore, the pilot of the steamship declares that he saw the tug's red, green, and white lights, saw the light waved from east to west on the dredge, and heard one blast from the tug's whistle, and, then concluding that the tug was pushing the dredge over to the eastward, gave a reply of one blast from the steamship's whistle, and ported his helm when within four or five ship lengths of the tug. He further declares that he first made out the navigation lights of the tug when the two vessels were "the best part of a mile" apart, that he saw the tug's red and green lights at "about the same time," and that he did not lose either of them at any time before the collision. By his own testimony it thus appears that for a considerable time before he changed the course of his steamship, and until she was within four or five ship lengths of the tug, and notwithstanding the tug's lights indicated to him that the tug was approaching him head on, or nearly so, and was pushing the dredge to the eastward, he still kept the dredge on his starboard bow, and obstinately persisted in continuing his course also to the eastward until the lantern was waved and the tug's signal given. The steamship had not been invited to that side of the river by anything done by the tug or the dredge. She had not been forced there by any contingency. She had culpably ignored the range lights. She had violated a plain duty imposed on her by the rules of navigation to keep to the right on observing the tug's red and green lights. Assuming that the tug did display to the steamship her red and green lights, and that by so doing she, too, violated the rules of navigation for the reason that she was tied to the dredge and not moving, that violation did not induce the steamship to hold to her dangerous course. On the contrary, as already intimated, it was a warning to her to change her course to the west and out of the way of danger. The display of the red and green lights, therefore, did not contribute to the collision. And, if the tug gave one blast after the steamship had approached within four or five ship lengths of the tug, as the steamship's pilot says she did, the danger of collision with the dredge or of fouling her port lines was then so imminent that the signal must be regarded as one given in extremis and wholly ineffective to charge the tug with any contributory fault.

We think the steamship alone should be held responsible for all the damages sustained by the dredge. The decree of the District Court is therefore reversed, and the record remitted to that court, with instructions to enter a decree against the steamship for the amount of the damages, with interest, and also with costs to each of the appellants in this court and in the District Court.