LINDE–GRIFFITH CONST. CO.

v.

THE AUTHENTIC.

NORTON v. DALZELL.

THE NO. 4.

No. 91, Docket 22834.

United States Court of Appeals Second Circuit.

Argued Jan. 4, 1954.

Decided March 3, 1954.

Hill, Rivkins, Middleton, Louis & Warburton, New York City, Allan B. Lutz, Thomas H. Middleton, New York City, of counsel, for appellant Henry K. Norton, as trustee.

Bigham, Englar, Jones & Houston, New York City, Charles A. Van Hagen, Jr., New York City, of counsel, for appellee, Linde-Griffith Const. Co.

Burlingham, Hupper & Kennedy, New York City, Stanley R. Wright, New York City, of counsel, for claimant-appellee, Lloyd H. Dalzell.

Before CHASE, Chief Judge, CLARK, Circuit Judge, and GIBSON, District Judge.

CHASE, Chief Judge.

The question to be answered on this appeal is whether the failure of a bridge tender to signal a tug which was towing a pile driver negligently into collision with the raised span of the bridge was negligence which contributed to the collision.

The facts, as justifiably found by the trial judge, are as follows:

There are two draw bridges across Overpeck Creek near its junction with the Hackensack River in Ridgefield Park, N. J. The easterly one is owned by the New York Central Railroad Company and the other, which is about 50 feet toward the west is owned by the appellant, the New York Susquehanna and Western Railroad, which is appearing in this litigation by Henry K. Norton, its sole trustee. This bridge is of the bascule or "jack-knife" type.

At about 8 o'clcok on the morning of October 31, 1947, the tug "Authentic" approached the New York Central bridge from the east with the pile driver "No. 4," which was owned by the libellant-appellee, Linde-Griffith Construction Co., on a hawser tow. The tug blew the usual three-blast signal to the bridges to indicate her desire to pass through to the Hackensack River and the draw in the New York Central was opened. The tender of the Susquehanna bridge answered with two blasts to forbid the nearer approach of the tug and tow because rail traffic was using that bridge.

The tug then nosed against the north abutment of the New York Central bridge and held there on half speed ahead for about ten minutes. Meanwhile the tender of the Susquehanna bridge, the rail traffic being over, raised its draw span to its normal elevation of 70 degrees. This was done by manually operating an electric switch which turned on the power and the

switch automatically kicked off, as it was set to do, when the seventy degree elevation of the span had been reached. At this point of elevation a green light appeared on the board before the operator. If a higher elevation were desired he could get an additional 3 degrees in gradual steps by easing the lever manually but that had to be done gently to prevent the automatic "kicking off" of the switch which closed the electric circuit. The additional 3 degrees of elevation would increase the unobstructed overhead clearance space by 3 feet.

When the green light showed, the bridge tender gave the tug the correct signal to proceed through the draw and the tug came on to do that. The opening through the bridge then gave the tug an unobstructed overhead space for a distance of 21 feet southerly from the northerly abutment of the bridge. This was enough for the tug and tow to pass safely, although in close quarters, for the "No. 4" was 23 feet wide and her leads extended 67 feet above the water, a distance greater than the maximum elevation of the upward end of the span. Those leads were at the middle of the forward end of the pile driver. They were 4 feet wide and there was 9½ feet of deck on each side of them. And so the tug had to keep within about 9½ feet of the southerly side of the northerly abutment of the bridge in order to pass through safely. About a week before the same pile driver had been safely towed through the same space. But this time there was a breeze of somewhat over 20 miles an hour blowing from the northwest which had some tendency to set the tug and tow away from the northerly abutment and, as the judge found, the captain "gave his entire attention to the water's surface and none to the rise or angle of the span, the width of the available channel, and the structure of the pile driver and the prevailing wind which tended to cast his tow to the south." In this way the tug went on until the leads of the pile driver were brought against the up-raised draw of the bridge at a point about 12 feet

below the top of the leads, damaging both them and the draw. The tug with its tow then went back easterly of the New York Central bridge and held there "until 10 o'clock when on the crest of the flood tide, by clinging to the north abutment of the bridge channel, it succeeded in effecting the passage without mishap."

The owner of the pile driver filed a libel against the tug, which was claimed by Lloyd Dalzell, and against the owner of the bridge. The owner of the bridge sued the tug owner. These suits were consolidated for trial.

The joint fault of the tug and the negligence of the bridge tender were held to have been the cause of the collision. Interlocutory decrees were entered under which the owner of the pile driver recovered half damages from the tug and half damages from the owner of the bridge with liability over against either for any balance which could not be collected from the other; and the bridge owner was awarded half damages against the tug owner. The owner of the bridge appealed and the owner and claimant of the tug filed an assignment of errors. The fault of the tug, however, has now been conceded and that issue is not now contested, the sole issue being the negligence of the bridge tender.

As to that the judge found as follows:

"Before the collision but after the tug had gotten under way through the bridge opening, the bridge tender knew that the pile driver would not pass the bridge. The process we have described of rearing the bridge through the higher sectors of its arc is under the control of the bridge tender only to the extent that he is operating the lever that controls the electric current which, however, may 'kick off,' to use the operator's expression, without his knowledge and without his knowledge of the exact position of the bridge at the time. It is found as a fact that at the time

he reached the conclusion or judgment that the pile driver could not effect a clear transit through the bridge opening that the bridge had stopped rising because the current had 'kicked off.' Never the less no warning, whether giving one was possible or not, was attempted and the operation of the bridge with respect to the pile driver was clearly negligent."

In so far as the pertinent facts were found, the learned judge carefully followed the evidence and we accept them. But we are unable to agree with his conclusion that the bridge tender was negligent.

 In performing its duty to maintain and operate the bridge so as not unnecessarily to impede navigation, the bridge owner was bound, to be sure, to give approaching vessels adequate warning. Clement v. Metropolitan West Side El. Ry. Co., 7 Cir., 123 F. 271; Oregon-Washington Bridge Co. v. The Lew Russell, Sr., 9 Cir., 196 F.2d 707. Signals had been given the tug by the bridge tender to stop and hold back while the draw could not be raised and, after the draw had been raised to its normal maximum height, to proceed on through. No other signals would have been needed had the tug gone through with due care; nor was the bridge tender under any duty to anticipate that the tug would be operated negligently. It was not until, as found by the judge, "the tug had gotten under way through the bridge opening" that the bridge tender knew there would be a collision. There is no finding that a signal then would have enabled him to avoid the collision. He testified that he was coming out under one bell and didn't look to see the angle of the draw; and also that when he "went a certain distance" he couldn't see it. This was evidently when he had approached too near for that. Asked if he could have stopped his tug and tow if he had looked, he replied, "I couldn't say." Not only is there no finding that a warning signal would have helped prevent the collision, or evidence

sufficient to support one, but the evidence is uncontradicted that the bridge tender did, when he saw the pile driver was not going to clear the draw, raise it as high as the bridge would go after the green light came on. His action was clearly *in extremis* and his decision to move the draw higher instead of giving what must even now be considered a probably futile signal was not a fault. The Favorita, 18 Wall. 598, 603, 85 U.S. 598, 603, 21 L.Ed. 856; The Stifinder, 2 Cir., 275 F. 271; The Pacific, 3 Cir., 154 F. 943.

 Moreover, the fault of the tug was so glaring compared to the only error in judgment on the part of the bridge tender, even if there were one, that the tug should be held solely to blame. The City of New York, 147 U.S. 72, 13 S.Ct. 211, 37 L.Ed. 84; The Fred B. Dalzell, Jr., 2 Cir., 1 F.2d 259.

Decrees reversed with directions to enter decrees holding the tug solely at fault for the damage to the pile driver; and holding the tug owner solely at fault for the damage to the bridge.