**CITY OF MOUNT VERNON, NEW YORK et al.**

v.

**THE ESSO NO. 5 et al.**

**THE ESSO NO. 12.**

**ESSO STANDARD OIL CO.**

v.

**CITY OF MOUNT VERNON, NEW YORK et al.**

**No. 242, Docket 23023.**

United States Court of Appeals, Second Circuit.

Argued April 15, 1954.

Decided July 23, 1954.

Arthur M. Boal, New York City (Tompkins, Boal & Tompkins, New York City, on the brief), for libelants-appellees.

Raymond T. Greene, New York City (Kirlin, Campbell & Keating, Ira A. Campbell, and Stephen J. Buckley, New York City, on the brief), for respondent-appellant.

Before CLARK, HINCKS, and HARLAN, Circuit Judges.

CLARK, Circuit Judge.

This appeal concerns the responsibility for an accident on June 29, 1949, involving the striking of a drawbridge maintained and operated by appellees, the City of Mt. Vernon and the Town of Pelham, New York, over Eastchester Creek on South Fulton Avenue between the two municipalities, by appellant's Barge Esso No. 12 in tow to its Tug Esso No. 5. The district court has placed liability entirely upon the tug, sustaining appellees' libel for the damages to the bridge and dismissing appellant's cross libel for damage to its barge. Appellant's appeal from the final decree thus entered in the consolidated action challenges the district court's findings as clearly erroneous and contends not only that the tug's navigation was not negligent, but also that the bridge tender's fault is a necessary conclusion as "a mathematical certainty" by reason of certain physical facts in evidence.

The tug and its tow, an oil barge which had discharged its cargo, left the Esso oil dock about 200 feet north of

---

5. Cf. In re Carasaoljo Hotel Co., 3 Cir., 8 F.2d 469.

the bridge about 9:00 p. m. on the day in question in order to proceed down Eastchester Creek to pass out under the bridge to the waters of Long Island Sound. The tug blew the appropriate signal of four blasts for the opening of the bridge, and the bridge opened in response to the signal. The bridge was attended and operated by one bridge tender. It is a rolling lift type bridge, working in a jackknife fashion, with the hinge located on the Mt. Vernon side of the creek, or to the right of the tug as it proceeded downstream. The bridge was electrically operated; by pressing a push button, the attendant would start an electric motor which would raise the bridge on its hinge. When opened to its maximum the bridge would automatically stop and would be locked in its open position by the pulling down of a chain controlling a brake or lock and thus cutting off the current. The bridge remains locked so long as the chain is held down by the attendant; when he releases the chain and again presses the button, the bridge closes. There were and had been no lights or light signal on the bridge; this circumstance, as the court found, had no bearing on the accident. The master of the tug who made this trip to Mt. Vernon "every other day or every day" testified that he coud perceive the opening of the bridge both by looking and by hearing the sound of the bridge motor. Here the motor stopped when he was about 100 feet from the bridge; there was also sufficient visibility so that he could see that the bridge was open. So he proceeded ahead slowly; the tug passed through, but the barge was not equally successful.

On the barge were two masts with booms attached, a "foremast" and an "after mast," nearly 100 feet apart according to the deck plan in evidence—as opposed to the master's testimony of 40 feet. As the court found, "both masts rose 24 feet above the deck level and both masts carried 40 foot booms, which when raised reached 44 feet above deck." The master of the tug, who was in his pilothouse at the wheel of the tug, thus described what happened: "Well, the tug passed through and the forward block on the boom, on the forward boom, caught on the bridge, and as we passed through further the after mast hit the bridge," and, as to what happened to that mast, that "[i]t went overboard." The bridge attendant, who also testified, did not see these details, but did say that the master had proceeded too close to the Mt. Vernon side of the channel; and both he and a police officer testified that the master immediately after the accident admitted he did not stay over far enough in the canal and hit the bridge. The attendant himself said that he had opened the bridge fully and kept it locked with the chain during the occurrences. The trial judge discredited the master's testimony as to the height of the forward boom (as only two feet above the top of the mast), and on the basis of all the evidence exonerated the bridge attendant and found the accident due entirely to the fault of the master in getting too far to the right of the channel.

Since there was obviously testimony bearing on these points the trial judge's conclusion and decision must stand unless, as appellant contends, the physical facts show that the accident could not thus have happened. The basis for this contention is through the testimony it proffered of an expert, a civil engineer who climbed upon and examined the bridge some two weeks after the accident and who was able to define the angle of extreme height of the bridge from the original plans for the bridge which he obtained from the Town Engineer of Pelham. Appellees object that, since the bridge was built in 1914, these measurements were 35 years old at the time of the collision and hence perhaps no longer accurate. But there seems no reason to suspect them of change, and apparently counsel did not at the time of trial. The crucial point of the expert's testimony is an exhibit showing the barge and mast superimposed upon an original plan of the bridge when raised and disclosing the "comfortable margin of 9.1 feet" between the top of the after mast and the

point of contact on the bridge itself. There is nothing wrong in these measurements themselves, but the conclusion which we are asked to draw of necessity that the bridge therefore could not have been fully opened depends on the acceptance of certain premises which seem doubtful. Thus the "point of contact" must be accepted as placed by the expert; and no allowance is to be made for the boom which could extend, as we have seen, for another 20 feet above the top of the mast. It may be noted incidentally that the expert's measurements demonstrate the inconsistency in the master's testimony that his forward boom was only two feet above the mast and yet caught the bridge.

As pointed out above, the testimony as to the details of contact must rest upon the account of a single witness, the master of the tug, who was held discredited in part at least by the trial judge. But it seems to be accepted now that the second striking was the more severe and the one which caused the substantial damage. So the expert was pointed to a mark on the bridge as the point of (second) contact, and this he decided was correct from its appearance and the nature of the injury. Appellees urge that this is the point of original contact, and that there is no evidence as to where on the lifted bridge was the point of second contact. (The master did testify that the barge veered to the right after the first contact, but that it could not go far for lack of space.) There does seem an ambiguity here which remains unresolved. The judge did not discuss this point and made no finding as to it or the one next to be decided; it seems probable that these somewhat refined claims were not made, or at least not appreciated, when he made his decision at once upon conclusion of the trial. They were not made in the pleadings or pre-trial proceedings, and certainly not explicitly in the evidence. It seems, therefore, that at the very least a trier need not accept the point of contact as definitely settled according to the expert's premise.

As much, if not more, ambiguity concerns the testimony as to the after mast striking the bridge. Appellees suggest that the master "was in no position to see whether it was the mast or the boom which struck, because he was in the pilothouse of the tug at the time. What this really means is that the boommast assembly struck the bridge and it was not determined whether it was the boom or the mast which made the contact." The point seems well taken. Here again we have no analysis from the trial judge, and for the general references to the after mast only the perhaps cursory statements of the master, as cited above. This could not well have been checked after the accident when the entire assembly had apparently gone overboard; at any rate there is nothing in the evidence further to distinguish boom from mast. That the top of the first boom could have hit the bridge and only the top of the after mast seems incredible. Appellant, conceding that the finding that the bridge was fully opened at the point of initial contact was justified on the evidence, argues that the bridge must have been partly closed by the time of the second striking. But this seems too much to accept. That in the time for the barge to have traveled from 40 to 100 feet the motor could have started and the bridge closed 9.1 feet or more—with no one claiming even to have heard the sound of the motor—cannot be considered realistic. Or if the bridge was actually damaged by the first impact to cause such a closing—surely an improbable hypothesis in itself—that fact does not show negligence of the bridge attendant. In other words, the inferences which the appellant would require are too violent to force upon any trier of facts.

Hence we conclude that there is far from a demonstration "to a mathematical certainty" that the bridge was lowered through negligent action of the attendant to lead to the accident. Indeed, as we have often pointed out, most lately in a similar bridge accident case, Linde-Griffith Const. Co. v. The Authentic, 2 Cir., 210 F.2d 757, there seems no reason

to strain for remote causes when the fault of the tug seems well buttressed, as the judge found. See also Tucker v. The Socony No. 9, 2 Cir., 167 F.2d 685, 687. And there is no occasion to consider a further claim of appellees that even if the bridge be considered only partly raised—contrary to the finding—yet the master, having a clear view, had the opportunity to avoid accident by keeping from the Mt. Vernon side of the channel.

Affirmed.