[Sac. No. 733.  In Bank.—December 19, 1900.]

ARGONAUT MINING COMPANY, Respondent, v. KEN-
NEDY MINING AND MILLING COMPANY, Appellant.

QUARTZ MINING CLAIM—PROCEEDINGS UNDER ACTS OF 1866 AND 1872—
RIGHTS OF OWNER.—The owner of a quartz mining claim patented
after the passage of the act of 1872, but located, applied for,
entered, and paid for under the act of 1866, is entitled to all of
the rights which attached to the original location of the lode
under the act of 1866 and to any additional rights conferred
upon the owner by the act of 1872.

ID. — PRESUMPTION AGAINST FORFEITURE — PRESUMPTION OF PREVIOUS
RIGHTS.—The presumption is very strong against the forfeiture of
rights secured to the owners of quartz lodes located under the
act of 1866; and the act of 1872 is to be construed against such
forfeiture. . The rights of locators under former laws were
expressly confirmed to them by the act of 1872.

ID.—PARALLELISM OF END LINES — EXTRALATERAL RIGHTS.—The end
lines of the surface location of a quartz lode located under the
act of 1866 and patented under the act of 1872 need not be
parallel in order to insure extralateral rights to the owner.

ID.—DIVERGENCE OF END LINES—MEASURE OF EXTRALATERAL RIGHTS.—
Where the end lines of such lode diverge from each other,
extralateral rights on the dip cannot exceed the stated number
of feet on the lode at any depth.  Such rights are not meas-
ured upon the dip by a plane coincident with the first end line
of the patented surface location and another one drawn parallel
thereto at the other end of the ledge, but exist between vertical
planes drawn perpendicular to the general strike of the lode
through the extreme points of its length.

APPEAL from a judgment of the Superior Court of Cala-
veras County.  G. W. Nicol, Judge presiding.

The facts are stated in the opinion of the court.

John M. Wright, and Byron Waters, for Appellant.

The owner of a quartz mining claim owns the surface and all
beneath the surface, if there is no extralateral right of the owner
of a properly located vein having its apex in other ground to
follow it beneath such surface. (*Cheesman v. Shreve*, 37 Fed.
Rep. 36; *Doe v. Waterloo Min. Co.*, 54 Fed. Rep. 935; *Consoli-
dated etc. Min. Co. v. Champion Min. etc. Co.*, 63 Fed. Rep. 540;

*Iron Silver Min. Co. v. Elgin etc. Co.*, 118 U. S. 196; *King v. Amy etc. Min. Co.*, 152 U. S. 222; *Argonaut etc. Min. Co. v. Turner*, 23 Colo. 400 [1] ; *Del Monte Min. etc. Co. v. Last Chance Min. etc. Co.*, 171 U. S. 55.) The mining right under the act of 1866 was bounded by parallel end lines. (Act of 1866, sec. 4; *Eureka etc. Min. Co. v. Richmond Min. Co.*, 4 Saw. 302, 322, 324; *Kinney v. Consolidated etc. Min. Co.*, 4 Saw. 382.) The intent was the same as to end lines and side lines, and the right to follow the dip, under the law of 1866 as under the act of 1872. (*Flagstaff Silver Min. Co. v. Tárbet*, 98 U. S. 463; *Walrath v. Champion Min. Co.*, 171 U. S. 293.) The rights of the patentee under the act of 1866 were limited and controlled by the surface location. (*Del Monte Min. etc. Co. v. Last Chance Min. etc. Co., supra.*) The patent issued under the act of 1872, though for a claim previously located, bound the locator by all the restrictions of that act. (*New Dunderberg Min. Co. v. Old*, 79 Fed. Rep. 598; *Lakin v. Dolly*, 53 Fed. Rep. 333; *Lakin v. Roberts*, 54 Fed. Rep. 461; 154 U. S. 507; *Carson City Gold etc. Co. v. North Star Min. Co.*, 73 Fed. Rep. 597; 83 Fed. Rep. 662; *Del Monte etc. Min. Co. v. Last Chance etc. Min. Co., supra; Michigan Land etc. Co. v. Rust*, 168 U. S. 589; *Brown v. Hitchcock*, 173 U. S. 473; *Botiller v. Dominguez*, 130 U. S. 238.) The survey is conclusive of the identity and description of the land claimed. (*Doe v. Waterloo Min. Co., supra; Matson v. Hord*, 1 Wheat. 130; *Menard v. Massey*, 8 How. 293; *Galt v. Galloway*, 4 Pet. 332; *McArthur v. Browder*, 4 Wheat. 488; *Bryan v. Forsyth*, 19 How. 334; *Last Chance Min. Co. v. Tyler Min. Co.*, 157 U. S. 683.) The rights acquired by the location and survey of a mining claim must necessarily be measured and extended from a beginning point and a base line. (*Atkins v. Hendree*, 1 Idaho Ter. 100; *Burke v. McDonald* (Idaho, Feb. 28, 1890), 33 Pac. Rep. 49; *Hansen v. Fletcher*, 10 Utah, 266; *Erhardt v. Boaro*, 113 U. S. 527; *Widbur v. Washburn*, 47 Cal. 67.)

Lindley & Eickhoff, William J. McGee, and F. J. Solinsky, for Respondent.

---

[1] 58 Am. St. Rep. 245.

The patent under the act of 1872 related to the inception of the right by the location under the act of 1866. (*Heydenfeldt v. Daney Gold etc. Co.*, 93 U. S. 634, 641; *St. Louis Smelting Co. v. Kemp*, 104 U. S. 636, 647; *Deffeback v. Hawke*, 115 U. S. 392, 405; *Jacob v. Lorenz*, 98 Cal. 332, 340; *Silver Bow etc. Min. Co. v. Clark*, 5 Mont. 378, 422; *Talbott v. King*, 6 Mont. 76, 106; *Butte City Smoke House Lode Cases*, 6 Mont. 397, 402; *Deno v. Griffin*, 20 Nev. 249, 252; *Eureka Case*, 4 Saw. 302, 317; *Kahn v. Old Telegraph Min. Co.*, 2 Utah, 174, 188; *Benson Min. etc. Co. v. Alta Min. etc. Co.*, 145 U. S. 428, 434.) The act of 1866 was but a crystallization of the miners' rules and customs, which, prior to congressional action, formed the Pacific coast common law of mines. (*Jennison v. Kirk*, 98 U. S. 453, 456; *Broder v. Natoma Water Co.*, 101 U. S. 274, 276; *Chambers v. Harrington*, 111 U. S. 350-52; *Northern Pac. R. R. Co. v. Sanders*, 166 U. S. 620, 634.) Under the local rules, as well as under the act of 1866, the lode was the principal thing, and the surface was, in reality, an incident. (*Johnson v. Parks*, 10 Cal. 447, 449; *Patterson v. Hitchcock*, 3 Colo. 533, 544; *Wolfley v. Lebanon Min. Co.*, 4 Colo. 112, 116; *Walrath v. Champion Min. Co.*, 63 Fed. Rep. 552, 556; *Del Monte etc. Min. Co. v. Last Chance Min. Co.*, 171 U. S. 55, 64; *Eureka Case, supra.*) Under the act of 1866 parallelism of end lines was not required for extralateral rights. (*Eureka Case, supra; Richmond Min. Co. v. Eureka Min. Co.*, 103 U. S. 839-47; *Iron Silver Min. Co. v. Elgin Min. etc. Co.*, 118 U. S. 196, 208; *Walrath v. Champion Min. Co., supra; Consolidated etc. Min. Co. v. Champion Min. Co.*, 63 Fed. Rep. 540, 550; *Carson City etc. Min. Co. v. North Star Min. Co.*, 73 Fed. Rep. 597, 599; 83 Fed. Rep. 658, 669.)

TEMPLE, J.—This is an action for damages for the value of ore alleged to have been taken by defendant from plaintiff's mine, situate in Amador county. The defendant denies taking any ore, or gold-bearing rock, from plaintiff's mine, and avers that defendant is the owner of the mine from which the rock was taken.

The cause was submitted in the trial court upon an agreed statement of facts, each party having the right to object to the relevancy, competency, and materiality of any part of it. Certain objections to evidence were made by the appellant, which

were overruled by the court, and the main argument here has been in regard to these rulings. Much of the evidence was objected to simply upon the ground of immateriality. All that I deem it necessary to say in regard to such rulings is that, admitting that the trial court erred as I am inclined to think it did, defendant has suffered no harm. The question of law upon which the case must turn is not changed or affected by receiving this immaterial evidence.

The controversy is indicated by the following diagram:

The plaintiff owns the Pioneer quartz mine, the defendant owns the Kennedy mine and the Silva mine. All three mines had passed to patent before the ore was taken out by defendant. The ore was taken under the Silva location, and within its exterior limits carried vertically down. It was taken from the discovery lode of the Pioneer location, which is the only lode which has its apex within that location. The lode enters that location near the middle point of the southern end line, and runs northerly through the location in a direction practically parallel to the side lines, through the center of the northern end line. In fact, save that the end lines are not parallel, the

location and the lode are the ideals upon which the rules and regulations of miners and the laws of Congress seem to have been based.

The defendant does not assert any right to the ore in dispute by virtue of its ownership of the Kennedy mine, and nothing further need be said about it.   Defendant asserts title to the ore by reason of its ownership of the Silva ground, under what counsel call the common-law right to everything beneath the surface.   It admits plaintiff's ownership of the Pioneer mine, and that the lode has its apex, as stated, within its surface location, but denies that the quartz taken by it from that lode is within that location.   This is asserted, as I understand the contention, upon two grounds: 1. Defendant contends that because of nonparallelism of the end lines of the Pioneer, it carries no extralateral rights; and 2. If the court can, as matter of law, construct for it parallel end lines, the southerly end line being the base line from which the location was projected, the parallel will be made by extending the northern end line in a direction parallel to the direction of the southerly end line.

The dip of the lode is easterly at an angle of about sixty degrees from the plane of horizon, and the end lines of the Pioneer diverge in that direction to the extent of about fourteen degrees forty-five minutes.   The ore was taken out directly beneath the Silva surface location at depths varying from fourteen hundred to two thousand feet beneath the surface.   The Silva location is more than nine hundred feet easterly from the easterly line of the Pioneer location.

The Pioneer was located, as the patent shows, under the law of 1866.   The application for a patent was filed January 13, 1871.   On the twenty-third day of February, 1872, the Pioneer entered and paid for its mine, and the patent is dated August 12, 1872.   The act to promote the development of the mining resources of the United States was passed May 10, 1872.

For reasons which will appear as this opinion proceeds, I think plaintiff is entitled to all the rights which would attach to such a location under the law of 1866, and to any additional rights which inured to such locations under the act of 1872.

Among the contentions of the respondent is this: "Although the end lines were not required to be parallel under the act of

1866, yet if by any process of reasoning any limitation upon the extralateral right was imposed upon the locators' title by reason of the divergence of end lines, such limitation was removed by the act of May 10, 1872, which granted to owners of locations theretofore made the right to pursue the vein on its downward course, between the end line planes of such location as it existed."

This proposition is based upon the language of the first proviso in section 3 of the law of 1872. After stating that the locators shall have certain lodes throughout their entire depth, although they may so far depart from a perpendicular in their downward course as to extend outside the vertical side lines, it proceeds: "Provided that their right of possession to such outside parts of said veins or ledges shall be confined to such portions thereof as lie between vertical planes drawn downward as aforesaid through the end lines of their location so continued in their own direction that such planes will intersect such exterior parts of said veins or ledges." Then follows another proviso, that no locator by reason of his right to the dip of his lode shall be authorized to enter upon the surface of a claim owned by another.

These provisos grant no rights additional to those already given, nor do they purport to do so. They are both express limitations upon rights already given. The proviso does not confer ownership to all within those planes, but says, in effect, that no locator may pass beyond them. No rule of construction with which I am familiar would authorize or require a different reading of the section, especially in the face of the evident policy to strictly limit the rights of all locators as to length along the vein or lode.

We have many graphic accounts of the rush of gold hunters to California in 1849. The river banks and gulches were suddenly crowded with eager and earnest men anxious to dig for gold. There was no law by which anyone could secure to himself any portion of the rich placers. In the absence of regulation, the strongest or most unscrupulous would get the lion's share. The miners, of necessity, made and enforced their own laws. Some regulations as to mining claims sprung into existence naturally, in fact necessarily: 1. So far as possible, each

person was given a specified portion of the ground which he could mine; 2. The allotment to each was so limited that there should be no monopoly. So far as possible all should have an equal chance. The right of the first possessor was preferred, but no matter was considered more important than the limitation upon the extent of the claims; and 3. As a corollary from these two cardinal rules, the third follows: that each claimant shall mark plainly upon the surface of the earth the boundaries of his claim, that others may locate claims without interfering with him.

These essential rules have been the basis of most of the rules and regulations of miners, and have been recognized in every mining district on the Pacific coast, and in all attempts by legislation, territorial, state, or national, to regulate mining locations. Indeed, it may be said that the purpose of all these laws and regulations is to secure these ends.

These views are, as I think, expressed by Judge Field in the celebrated Eureka case, 4 Saw. 302. The locations there considered were made under the law of 1866, and one of the questions to be decided was whether the defendant was entitled to its allotted distance along the vein, although in its strike the vein passed beyond its exterior surface lines. There was no contention based upon diverging end lines, and there could not have been; for the ore body in dispute was within planes passing through the end lines of the Champion location, which belonged to plaintiff, and was not within such planes passing through the end lines of any location under which defendant claimed. Defendant, on this point, simply contended that it had the oldest location, and under the law of 1866 had a right to the number of feet on the lode called for in its location, although it extended within the junior locations owned by plaintiff. It was held that defendant could not follow the lode on its strike through any line of its surface location. In reaching this conclusion the court emphasized the invariable and inexorable policy to limit the location along the course of the vein to the quantity located, and to the line of the surface location, and to permit an extension of right only on the dip.

Bearing, then, in mind that the argument was to show that under the law of 1866 the locator could not, for the purpose

of securing his length of lode, pass the lines of his surface location, we may be instructed by the decision. It is first said the locations under the law of 1866 are not invalid because the end lines are not parallel. The law did not require such parallelism, and the requirement in the law of 1872 was merely directory and no consequence attached to a deviation from the direction. "Its object is to secure parallel end lines drawn vertically down, and that was effected in these cases by taking the extreme points of the respective locations as the length of the lode."

The locator was limited to his number of feet on the lode throughout its entire depth, and the court realized that the only possible mode of so limiting the right was by parallel end lines. The miners seem to have regarded a lode as something like a plank. All a locator had to do was to measure off his distance upon it, and then make a "square cut" at the end. Judge Field's idea that the planes of the end "cuts" must be parallel in order to limit the locator at all depths to his number of feet claimed upon the surface is further shown. He says: "It is true that end lines are not in terms named in the rules of the miners, but they are necessarily implied, and no reasonable construction can be given to them without such implication. What the miners meant by allowing a certain number of feet on a ledge was that each locator might follow his vein for that distance on the course of the ledge, and to any depth within that distance. So much of the ledge he was permitted to hold as lay within vertical planes drawn down through the end lines of his location, and could be measured anywhere by the feet on the surface. If this were not so, he might by the bend of his vein hold under the surface along the course of the ledge double and treble the amount he could take on the surface. Indeed, instead of being limited by the number of feet prescribed by the rules, he might in some cases oust all his neighbors and take the whole ledge. No construction is permissible which would substantially defeat the limitation of quantity on a ledge, which was the most important provision in the whole system of rules.

"Similar rules have been adopted in numerous mining districts, and the construction thus given has been uniformly and everywhere followed. We are confident that no other construction has ever been adopted in any mining district in California or Nevada. And the construction is one which the law would

require in the absence of any construction by miners. If, for instance, the state were to-day to deed a block in the city of San Francisco to twenty persons, each to take twenty feet front, in a certain specified succession, each would have assigned to him by the law a section parallel with that of his neighbor of twenty feet in width, cut through the block. No other mode of division would carry out the grant.

"The act of 1866 in no respect enlarges the right of the claimant beyond that which the rules of the mining district gave him. The patent which the act allows him to obtain does not authorize him to go outside of the end lines of his claim, drawn down vertically through the ledge or lode. It only authorizes him to follow his vein with its dips, angles, and variations, to any depth, although it may enter land adjoining— that is, land lying beyond the area included within his surface lines. It is land lying on the side of the claim, not on the ends of it, which may be entered. The land on the ends is reserved for other claimants to explore. It is true, as stated by the defendant, that the surface land, taken up in connection with a linear location on the ledge or lode is, under the act of 1866, intended solely for the convenient working of the mine, and does not measure the miner's right, either to the linear feet upon its course, or to follow the dips, angles, and variations of the vein, or control the direction he shall take. But the line of location taken does measure the extent of the miner's right. That must be along the general course, or strike, as it is termed, of the ledge or lode. Lines drawn vertically down through the ledge or lode, at right angles with a line representing this general course at the ends of the claimant's line of location, will carve out, so to speak, a section of the ledge or lode, within which he is permitted to work, and out of which he cannot pass."

Judge Field here was endeavoring to show that the locator was limited under the law of 1866 to the specified number of linear feet on the lode throughout its entire depth. The extent of his right could be measured by the feet on the surface. The statement that the requirement in the law of 1872, that the end lines shall be parallel was only directory, was overruled in *Iron Silver Min. Co. v. Elgin Min. etc. Co.,* 118 U. S. 196, but that

the limitation upon the line or distance on the lode continues throughout its entire depth has always been recognized. And, indeed, it seems obvious that the opposite contention could not be thought of. A proposed rule may be tested by inquiring what may be done with it. Suppose the divergence here had been one hundred and fifty degrees instead of fifteen, the dip being at a small angle from the plane of the horizon. The statutory limitation upon the length which could be taken on the lode would be a farce, even were the ledge the ideal ledge of miners. The Pioneer would soon have extended itself to the entire length of the lode.

I think the law of 1872, instead of extending the rights of locators under the law of 1866 along the lode, expressly limits them in that respect to the rights they had under the previous laws. Section 2 provides: "Mining claims upon veins or lodes . . . . heretofore located shall be governed, as to length on the vein or lode, by the customs, regulations, and laws in force at the date of their location."

These words themselves, in my opinion, are sufficient to support the declaration of the court in the Eureka case. Speaking of the limitations provided in section 3 of the act of 1872, which I have noticed, of lodes to planes through the end lines, "The act in terms annexes these conditions to the possession not only of claims subsequently located, but to the possession of those previously located. This fact, taken in connection with the reservation of all rights acquired under the act of 1866, indicates that in the opinion of the legislature no change was made in the rights of the previous locators by confining their claims within the end lines. The act simply recognized a pre-existing rule applied by miners to a single vein or lode of the locator, and made it applicable to all veins or lodes found within the surface lines."

This proposition is substantially reiterated in *Iron Silver Min. Co. v. Elgin Min. etc. Co., supra,* and in many other cases, including the latest to which our attention has been called —*Walrath v. Champion Min. Co.,* 171 U. S. 293.

It remains but to add on this point that the patent under which plaintiff claims only grants of the discovery lode fifteen hundred and eighty-nine and ninety-four one-hundredths linear

feet "of the said Pioneer quartz vein, lode, ledge, or deposit, as hereinbefore described, throughout its entire depth; . . . . provided, that the right of possession to such outside parts of said veins, lodes, ledges, or deposits shall be confined to such portions thereof as lie between vertical planes drawn downward through the end lines of said survey at the surface, so continued in their own direction," etc.   And in the habendum is added as a condition, "that the grant hereby made is restricted to the land hereinbefore described as lot No. forty-eight (48), with fifteen hundred and eighty-nine and 94-100 linear feet of the Pioneer quartz vein, lode, ledge, or deposit throughout its entire depth," etc.

I think it clear that there is no attempt here to convey all within planes passing through the end lines, if such planes would at any depth include more than the amount specifically defined on the strike of the lode.

Upon this conclusion, that a patent to a location with end lines diverging in the direction of the dip does not convey all within those planes, but at the most not more than the stated number of feet on the lode, at any given depth, the appellant contends that such patent grants no extralateral rights at all. Such would be the law if the location were under the law of 1872, and as the patent to the Pioneer was issued after that law took effect counsel contends that it is subject to its requirement that the end lines must be parallel or the patentee has no extralateral rights.   Another objection is that there is no description of the segment of the lode which extends beyond the surface location, and no grant can be effectual which does not define the thing granted.

Parallel end lines were not required in locations by the law of 1866, and yet extralateral rights were specifically given.   The act refers to rules and regulations made by miners, but it is not said that any such rule required parallel end lines.   It is claimed in argument that such was, in general, the custom of miners, but it is not even contended that there was such a custom in Amador county, and all the patents shown in this case lack such parallelism.

I think it would have been competent for Congress in the law of 1872 to have required parties who had equitable rights

to patents to cause such adjustments of their surface lines as would indicate and define their extralateral rights—in other words, to have made their end lines parallel before a patent would issue, on pain of losing all extralateral rights. There are no such provisions in the act of 1872, but the rights of locators under former laws are expressly confirmed to them.

The presumption is very strong against forfeiture, and against such construction of any law as would work a forfeiture. The language of an act, to have such effect, must be very plain, or the court will, if possible, give a construction to it that would not have that effect.

It is admitted that such extralateral rights are recognized and asserted in the Eureka case, and I think in the language used by Judge Field in *Iron Silver Min. Co. v. Elgin Min. etc. Co.*, *supra.* The "Horse Shoe case" is equally clear upon this matter: "Under the act of 1866 (14 Stats. at Large, 251), parallelism in end lines of a surface location was not required, but where a location has been made since the act of 1872 such parallelism is essential to the existence of any right in the locator or patentee to follow his vein outside of the vertical planes down through the side lines." This very clearly implies that a locator under the act of 1866 has such right, although his end lines are not parallel. In many other cases the same thing is implied. (*Del Monte Min. etc. Co. v. Last Chance Min. etc. Co.*, 171 U. S. 55; *Walrath v. Champion Min. Co.*, 63 Fed. Rep. 552; 171 U. S. 293.)

We come, then, to the other phase of the question: Can it be determined as matter of law, from the patent or the complaint, what segment of the dip, if any, the plaintiff acquired by his location or patent? It is admitted, or rather contended, by counsel on both sides that the court cannot construct end lines. If the court is to adjudge that plaintiff is entitled to follow the dip beyond his lines, it must find some mode of limiting the right along the vein, and that limitation must result as matter of law from the patent, when the necessary facts are shown as to the property it attempts to convey—that is, as to the course and dip of the lode.

The contention of the parties in regard to this matter is shown upon the diagram. Of course, it is understood that plain-

tiff contends for all included between planes drawn through its end lines, although they diverge and would inevitably extend his rights along the strike. While defendant contends that because of such divergence plaintiff has no extralateral rights. But each party has an alternative theory, in case its primary contention is not sustained. Plaintiff says, if planes through its end lines do not control, then planes are indicated between lines perpendicular to the general course of the lode.

Defendant's alternative is that, as the southern end line constitutes the initial line in the survey, it necessarily follows from the requirement of parallel end planes that the northern end line shall be parallel to it. That by locating and fixing the southern end line first the northern end line was thereby also definitely and finally located. These theories are shown in the diagram: 3-5 is the southern end line continued; 1-6 is a parallel line from the northern end of the lode. This shows defendant's theory. These lines would give the ore in dispute to defendant.

The lines suggested by plaintiff are 1-2 and 3-4. These are at right angles to the general course of the lode, and planes descending through them would give the ore to plaintiff. The line B-B' is the northern end line continued, and between that line and 3-5 is plaintiff's first contention, which we have considered.

I am not referred to any authorities which support the contention of appellant that the southern end line must be considered as the base from which the surface form of the location was projected. As stated, the argument is that having been first located it followed, as matter of law, that the other end line must be in the same direction in order that end lines may parallel. But the location was made, surveyed, the land paid for, and application made for the patent before the law of 1872 was enacted. The act of 1866 did not require parallel end lines to insure extralateral rights, or at all. There was, therefore, no implication that the second end line should be parallel to that first established. It was not an absolute necessity that by a naked description one end line should be described before the other. A side having been located, one sentence could have created both end lines from each end and at right angles to

the side line in a certain direction. No such general rule, therefore, applicable to all cases could be adopted. Planes so constructed could not result as matter of law.

Planes through the lode at the end lines of the location at right angles to the general course would impose the required limitation upon the rights of the locator along the lode. The rule that they must be so constructed would be universally applicable—at least theoretically. The congressional system for the sale of mineral lands is founded upon the proposition that the course of the lode can be traced. That nature, in her infinite variety, does not always so deposit her mineral gifts is unfortunate; but I think in construing the law we may have regard to the views of the lawmakers in regard to its subject, however crude and inadequate such views were. The law of 1866 is said to have been but a crystallization of the rules and customs of the miners. The first lodes worked were, I think, nearly in a uniform direction. The individual claims were short, usually two hundred feet. Under such circumstances it was not difficult to appropriate to each his number of feet on the dip at any depth. In California mines such claims were very often consolidated and disputes avoided. Often, as on the Comstock lode, the miners agreed upon a base line from which the surface form of locations were projected, or to which they were adjusted. This would result in parallel end lines.

The general practice, I think, was to have their claims bounded, so far as the lode was concerned, by parallel end lines, whatever might be the form of their surface location. In fact, they adopted the idea put forth by Judge Field in the Eureka case. Their rights on the lode were limited to planes at the limit of their right to the lode on the surface, at right angles to the general course of the lode.

The Eureka case is perhaps the only express authority for this proposition, but I do not find, as claimed by the learned counsel for the appellant, that it has been repudiated by later cases. On the contrary, these cases which imply extralateral rights when the end lines are not parallel seem to concede this rule. I am unable to understand *Walrath v. Champion Min. Co., supra,* upon any other theory. There was liberty of surface form under the act of 1866, but the law strictly confined

the right on the vein below the surface. This accords both with the Eureka case and the Flagstaff case. In the latter case it was said: "But our laws have attempted to establish a rule by which each claim shall be so many feet of the vein lengthwise of its course to any depth below the surface, although laterally its inclination shall carry it ever so far from a perpendicular." But rights on the strike were limited by the surface lines of the location under both laws. Judge Field was familiar with the mining customs and laws. I have no doubt he expressed in the Eureka case what had been and was the universal understanding and practice of miners. The rule there declared seems to me reasonable, and, in fact, the only one that can be applied to such patents issued under locations made before the law of 1872 came into existence. If, as suggested, the officers of the land office usually adjust and make the end lines of locations parallel before issuing the patent, such patents, when issued, will be conclusive evidence that such also was the location.

A case has been cited in which the end lines of the location converge in the direction of the dip. (*Carson City etc. Min. Co. v. North Star Min. Co.*, 73 Fed. Rep. 597.) It was held that the locator had extralateral rights because the conveyance would give less, rather than more, on the dip of the vein. This may be all right, as it seems to me, however, not because the patent carries less, rather than more, than would pass had the end lines been parallel, but because that which is granted is described so that it can be definitely located. Under the force of the restriction contained in section 3 of the law of 1872, the locator could not take beyond planes through his end lines. This confined him within well-defined boundaries to less on the dip below the surface than he had upon the surface. If this was an attempt to construe the act of 1872, the logic might be questioned. That act, as construed, does not grant extralateral rights, because the end lines are parallel or converge toward the dip of the vein, but if they are parallel. The location there under consideration was made under the act of 1866, and carries extralateral rights because the extent of such rights are definitely described. At least, such was the fact, and no other reason was required. It was, therefore, not necessary in that case to consider the point here under debate.

If this position be correct, the complaint does definitely describe the segment of the lode from which the ore was taken.

The judgment is affirmed.

McFarland, J., Garoutte, J., Henshaw, J., Harrison, J., and Beatty, C. J., concurred.