[Civ. No. 37379. Second Dist., Div. Four. Jan. 31, 1972.]

HARBOR INSURANCE COMPANY, Plaintiff, Cross-defendant and Respondent, v.
RESOLUTE INSURANCE COMPANY, Defendant, Cross-complainant and Appellant.

**COUNSEL**

MacDonald, Halsted & Laybourne, Robert W. McMahon, Thompson, Coe, Cousins, Irons & Porter and Emory L. White, Jr., for Defendant, Cross-complainant and Appellant.

Booth, Mitchel, Strange & Willian and Owen W. Strange for Plaintiff, Cross-defendant and Respondent.

**OPINION**

**JEFFERSON, Acting P. J.**—Defendant Resolute Insurance Company, a Rhode Island corporation (hereinafter referred to as Resolute) appeals from a judgment of the superior court, sitting without a jury, which determined that it is liable to reimburse Harbor Insurance Company, a California corporation, (hereinafter referred to as Harbor) in the amount of $27,000.

The record discloses that Harbor and Resolute were each involved in various transactions relating to the formation and conduct of a business activity by Americana Crop Hail Pool, Inc. (hereinafter called Americana).

Americana appears to have been established by its principal officers (Clifford Manus, Robert Bacon and C. E. Bullock) for the purpose of creating and administering a "pool" to insure farmers against loss of crops due to hail storms. The idea was to spread the risk of almost certain loss among numerous insurance firms willing to accept such risks in limited amounts. Americana was not a new company; it had done business for several years prior to 1964, the year in which these events occurred.

Since Americana was not an insurance company, it could not act as an insurer, nor could it assume risks in its own name or issue policies. Americana acted only as "pool manager." Its officers, or insurance brokers employed by them, sought to obtain both a "fronting company," i.e., an insurance company willing to have its policies issued to individual farmers purchasing crop hail insurance, and "pool participants," i.e., other insur-

ance companies who, by separate contracts with Americana, would agree to participate in the profits and losses of the pool. Americana, as manager, agreed to obtain certain described crop hail insurance business for such companies. The agreement with which this case is concerned covered 1964. Resolute as "front company" for the pool received a payment of $15,000 in advance as its fee.

An insurance company may by contract act as front company (that is, agree to have its policies issued by the pool) but may at the same time limit its participation so that it has neither liability nor interest in the profits realized from pool operation. In certain cases, the policies of other participants may, pursuant to the pool agreement, also be issued by the pool manager. The issuance of a particular company's policy is of no significance from the standpoint of either ultimate liability or profits since insurance business is obtained by the manager and shared by the participants in accordance with their respective interests in the pool. The front company is the single exception; it receives a percentage, in this case one percent of gross premiums, for use of its name and for such services as it might be required to perform as policy issuer.

The management firm, to be relieved from the burdens of obtaining participating insurance companies, may appoint a broker or brokers, generally one or more individuals or a firm of persons highly skilled and knowledgeable in the reinsurance business, to locate insurance companies who are willing to enter the insurance pool. These brokers may also solicit "reinsurance companies" to reinsure the risks agreed to be taken by the pool participants where this is made a condition of the participation or where it is deemed desirable by the manager for other reasons. In the instant case, two brokers were used by the Americana pool, Stewart Smith, Inc. and D. L. O'Donoghue, Inc.

Since these pools insure risk of loss by a large number of farmers, the potential loss from hail damage might be too great for one firm to be willing to underwrite the risk by itself. This situation occurred in the present case because less than an adequate number of companies purchased shares in the pool. In order to secure adequate participation in the pool, the management firm (Americana) through its brokers sought to obtain reinsurance from an additional insurance company or companies. When reinsurance is thus obtained, the "reinsurer" signs a copy of the "pool agreement" but its liability and interest in the profits realized is limited. It enters the pool solely to reinsure a primary company's risk. Reinsurance is simply a purchase by one insurance company, which is a pool member, of insurance on the losses it may be required to pay, for which it pays a premium to the reinsuring company.

Reinsurance includes "facultative" insurance, which provides that a reinsurer will insure only one aspect of the risk, and "treaty insurance," which is the term used where a reinsuring company agrees to reinsure all aggregate claims of the primary risk company. There is also "stop-loss" reinsurance which is obtained when one or more of the participating companies desires to hold its losses to a certain percentage of all aggregate claims. In order to stop its losses at a certain percent of the aggregate claims, such a company may purchase or have purchased for it stop-loss coverage to pay claims above an agreed aggregate claim percentage.

Resolute, in the present case, agreed with Americana to purchase shares and to become a member in the pool organized to cover crop loss due to hail damage for the year 1964. Resolute, however, had been a member of pools formed by Americana each year beginning in 1962 and had suffered heavy losses for its efforts in those previous pools. Therefore, Resolute agreed to be a front company of the pool, to take one share of the pool stock and thus to obtain the benefits of the agreed one percent of the premiums paid for the hail coverage, but solely on the condition that Resolute's one share of the pool be 100 percent reinsured by Americana.

D. L. O'Donoghue, Inc., as broker for Americana, approached Harbor and obtained its agreement to reinsure Resolute's one share interest in the pool, to the extent of three shares of the pool as reinsurer. Resolute was not an underwriter of the primary risk but, on the basis of this protection, it had agreed to be a front company, and thus Resolute felt it could obtain the one percent premium benefit without incurring any risk with respect to crop-hail losses.

In order for Americana to create the pool and to proceed to sell policies, it had customarily obtained broad powers of attorney from all pool companies participating; such documents empowered Americana to act in behalf of those companies.

After Resolute made clear the condition of its entry into the pool (that its one share be 100 percent reinsured) it then, on or about January 29, 1964, reinstituted with Americana the power of attorney which it had given to Americana during the pools of 1962 and 1963 but had retracted prior to 1964. This power of attorney was extremely broad[1] and

---

[1] "That the Resolute Insurance Company, of Providence, Rhode Island, has made, constituted and appointed, and by these presents does make, constitute and appoint the following, namely, C. L. Manus, R. F. Bacon, and C. E. Bullock, of Americana Crop Hail Pool, Inc., Daytona Beach, Florida, its true and lawful attorney, for it, and its name, place and stead, to appoint or cancel general agents in the United States of America and Canada for the writing of hail on growing crops insurance;

had been used for a number of years previously in the crop pools established by Americana wherein Resolute was a participant. Until Americana obtained this power of attorney from Resolute (the only front company it obtained for the 1964 crop-hail pool), it had no authority to set up the group as an operating business since it could issue no insurance policies.

On July 31, 1964, Harbor executed the pool agreement with Americana, the agreement to be retroactive to January 1, 1964. Article III of the agreement, which relates to commencement of the crop-hail pool, provides: "The participation of each company in AMERICANA CROP HAIL POOL, shall be pro rata of the total number of shares subscribed by all participating companies for each respective season.

"AMERICANA CROP HAIL POOL shall consist of not more than one hundred fifty (150) shares, nor less than seventy-five (75) shares during any seasonal year.

"When a Company once subscribes to shares in this Agreement, such subscription shall continue until reduced or cancelled as hereinafter provided."

The pool did not sell the required 75 shares prior to issuing policies bearing Resolute's name; in fact, it sold a total of only 33.1 shares to regular participating companies, but it represented to Harbor that the pool was fully subscribed. The remaining shares were purportedly supplied by the purchase of "stop-loss" reinsurance by Americana for the benefit of the other participating companies.

Pursuant to the power of attorney given to it by Resolute, Americana set up the pool in this manner and proceeded to issue the policies bearing Resolute's name to various farmers. The farmers purchased the insurance in the spring to protect an anticipated fall harvest. Their premium payments were financed by "premium notes" given by the farmers. Claims for hail

---

to make and enter into reinsurance agreements with other insurance companies either for accepting or purchasing reinsurance in connection with hail on growing crops insurance, to accept and deposit to the account of Americana Crop Hail Pool, Inc., all funds collected from hail on growing crops insurance issued through general agents of Americana Crop Hail Pool, Inc., and all funds collected for premiums for reinsurance companies; giving and granting under said attorney full power and authority to do and perform all and every act and thing whatsoever requisite and necessary to be done in and about the premises as fully, to all intents and purposes, as the officers of said company might or could do if personally present; hereby ratifying and confirming whatsoever the said attorneys shall and may lawfully do by virtue hereof in the premises, it being expressly understood and agreed that said Power of Attorney shall continue indefinitely until cancelled by said company, and that it may be cancelled as of December 31st, at midnight, of any year."

damage were presented by the insured farmers for the 1964 crop year. Americana was financially unstable and had no funds to pay such claims. The notes representing the farmers' premium were unavailable for this purpose since they were held in escrow. As a consequence, Americana, pursuant to the power of attorney given it by Resolute, requested all companies holding shares in the pool to pay, at the rate of $9,000 per share, funds to Americana to assist it in paying claims and expenses. Some companies paid; other companies did not. Harbor paid to Americana $9,000 per share for the three shares indicated by its agreement, total of $27,000.

It was impossible for Americana to meet all claims and expenses and the company collapsed financially. Thereafter, Harbor, which had paid out $27,000 to Americana on the representation made by officers of Americana to Harbor that the pool had been fully subscribed, brought suit against Resolute, alleging that Resolute's power of attorney was the empowering document giving Americana authority to solicit the $27,000 from Harbor; that in making its false representations, Americana was the agent of Resolute; and that on this basis Resolute was liable to Harbor to reimburse the $27,000 payment falsely induced. Resolute in its answer denied any agency liability and it separately cross-complained against Harbor, alleging that Harbor was liable to pay Resolute a proportion of expenses including, inter alia, premium taxes, claims and legal expenses.

The trial court, upon hearing all of the evidence, issued findings of fact and conclusions of law to the effect that Americana, its officers and brokers were agents of Resolute and were acting in the course and scope of their authority during the year 1964 up until November 23, 1964; that Manus and Bacon were officers and employees of Americana during the year 1964 and were designated as attorneys in fact for Resolute in a written power of attorney executed by Resolute dated September 21, 1961, and reinstated by Resolute on January 29, 1964, which remained in force until November 23, 1964; that Manus and Bacon acted pursuant to the written power of attorney in forming and managing the crop-hail insurance pool for the year 1964; and that at the time Harbor advanced $27,000 to the account of Resolute, Manus and Bacon were the actual agents of Resolute and were acting in the course and scope of their authority in requesting and receiving the sum of $27,000 from Harbor. The court further found that Harbor had paid the $27,000 on August 5, 1964, under a mistake of fact and in reliance upon representations of and at the express request of the agents of Resolute. It also found that Harbor was entitled to the sum of $27,000; that Harbor was not indebted

to Resolute for any sum or sums of money; and that Harbor was not a participant in and was not bound by the Americana "Interests and Liabilities" agreement.

▇ Resolute first contends that the evidence is insufficient to support the trial court's finding that Americana was its agent in the formation of the insurance pool and dealing with others in relation to the business of the pool.

The specific issue is whether Americana was, in connection with its activities relating to the formation of the pool and subsequent requests for advancements of funds, acting as the authorized agent of Resolute. Although Resolute contends that the evidence shows that it had been agreed, between it and Americana, that the powers granted by the written power of attorney were not to be exercised in the manner in which Americana acted in this case, the trial court was not required to believe that self-serving testimony and could (as it did) believe that Resolute had given to Americana the full range of powers expressed in the written power of attorney. Having made that finding of *actual* authority (Finding Nos. II and VIII) it is immaterial that Harbor did not see or learn of the written power until after it paid the $27,000.

▇ Resolute further contends that the evidence is insufficient to support the finding that Harbor was not a pool member or participant but paid $27,000 to the account of Resolute under a mistake of fact in reliance upon the representations of Resolute's agents. On this basis Resolute claims that it was entitled to retain the $27,000 as reinsurance pursuant to the allegations of its cross-complaint.

The "Interests and Liabilities" portion of the various agreements constituting the pool was executed by Harbor and it is therein provided that Harbor shall assume liability for three shares of a total of 75 shares of pool participation. It is undisputed that an insufficient number of regular participating shares were contracted for and that Americana attempted to satisfy the 75-share requirement by obtaining stop-loss reinsurance to cover the balance.

▇ Although Resolute claims that there was testimony of an expert that this practice constituted proper and adequate pool participation, there is no disclosure in the brief as to where this testimony may be found in the record; we are not required to consider the point. (6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 421, p. 4389; Cal. Rules of Court, rule 15(a); *Fox* v. *Erickson,* 99 Cal.App.2d 740, 742 [222 P.2d 452].) ▇ There is clear testimony that, since such reinsurers (sub-

stituted for regular participating companies) did not generally execute an "Interest and Liabilities" agreement, they could not be considered part of the regularly contemplated pool participation.

Assuming the existence of the conflicting expert testimony, the evidence in this regard was weighed and the conflict resolved by the trial court in Harbor's favor. (*Overton* v. *Vita-Food Corp.,* 94 Cal.App.2d 367 [210 P.2d 757].) On the record presented before this court it clearly appears that substantial evidence supports the trial court's determination that Harbor was not a participant in the crop-hail pool agreement since, inter alia, subscription of the 75-share crop-hail pool by regular participating companies was a condition to its obligation. As a consequence, Harbor had no liability and was induced to make payments in reliance on the misstatements of Resolute's agents. It is therefore, entitled to reimbursement from Resolute for the $27,000 paid to the pool on Resolute's behalf.

Finally, Resolute contends that it is entitled, by the evidence adduced pursuant to its cross-complaint, to recover from Harbor the sum of $6,410.25, which allegedly represents Harbor's pro rata share of expenses based on its participation in the Americana Crop Hail Pool Agreement. Since Harbor bore no contractual liability by virtue of the failure of the condition, as hereinabove determined, it had no obligation to pay any portion of premium taxes, claims, or other expenses relating to the pool.

The finding of actual agency is supported by the record and that finding supports the further finding that Harbor was not a participant in the pool. The judgment in favor of Harbor on the complaint and on the crosscomplaint is in accord with these findings.

The judgment is affirmed.

Kingsley, J., and Dunn, J., concurred.

A petition for a rehearing was denied March 1, 1972.