[No. A028937. First Dist., Div. One. Dec. 4, 1985.]

GERTRUDE TROENSEGAARD, Plaintiff and Respondent, v.
SILVERCREST INDUSTRIES, INC., Defendant and Appellant.

**COUNSEL**

Burton K. Wines and Socrates Peter Manoukian for Defendant and Appellant.

Britton, Jackson, Cartwright, Dunlap, Burdick & McCormack and Sandra C. McCormack for Plaintiff and Respondent.

**OPINION**

**ELKINGTON, J.**—Plaintiff Gertrude Troensegaard, on September 19, 1983, commenced an action against Silvercrest Industries, Inc. (Silver-

crest), and others, for damages for personal injuries based on breach of express warranty, products liability, and fraudulent concealment. Compensatory, punitive, and a "civil penalty" of, damages were sought. The subject of the action was a mobilehome, claimed to have exuded unacceptable formaldehyde fumes, which was manufactured by Silvercrest and sold to plaintiff. The action was compromised and settled before trial for a total of $6,000 as to certain defendants, not including Silvercrest, and was thereafter tried against that defendant alone. A jury returned a verdict against Silvercrest for $90,000 compensatory damages, $55,000 punitive damages, and $90,000 as a "civil penalty." The court thereafter awarded plaintiff her attorney's fees of $56,555, and costs of $35,726.71. Judgment was entered accordingly, from which judgment Silvercrest has appealed.

We note initially (see Evid. Code, §§ 452, subd. (b), 459) that the sale of *mobilehomes* generally, and the emission therein of formaldehyde fumes, have been the subject of much state concern. In 1971 the Legislature added Civil Code sections 1797-1797.5, mandating (§ 1797.3) that manufacturers of mobilehomes shall confer upon their ultimate purchasers a "Mobilehome Warranty," as follows:

"(a) That the mobilehome . . . is free from any substantial defects in materials or workmanship.

"(b) That the manufacturer . . . shall take appropriate corrective action at the site of the mobilehome . . . in instances of substantial defects in materials or workmanship which become evident within one year from the date of delivery of the mobilehome . . . to the buyer, provided the buyer . . . gives written notice of such defects to the manufacturer . . . not later than one year and 10 days after date of delivery."

Civil Code section 1794, subdivision (c), provides that where *failure* to comply with such a warranty is *"willful"* the buyer may, in addition to his or her compensatory damages, recover "a *civil penalty* which shall not exceed two times the amount of actual damages." (Our italics.) And subdivision (d) of section 1794 also permits as damages under such circumstances, "a sum equal to the aggregate amount of costs and expenses, including attorney's fees based on actual time expended, determined by the court to have been reasonably incurred by the buyer in connection with the commencement and prosecution of such action, . . ."

We further note at this point that in 1982 the Legislature enacted Health and Safety Code section 18615, stating (the italics is ours):

"The Legislature finds and declares that:

"(a) Energy-saving features in new conventional and manufactured housing and commercial and other buildings have substantially reduced the air exchanges in those structures.

"(b) Contaminants in indoor air present a *potential health hazard* to occupants of such structures.

"(c) Off-gassing of *formaldehyde vapors* has been shown to occur in housing utilizing building materials of plywood and particle board.

"(d) Occupants of *mobilehomes* have reported instances of symptoms consistent with those produced by exposure to *formaldehyde vapors.*"

Health and Safety Code section 18616, enacted at the same time, provided that: "The State Department of Health Services shall make a recommendation to the department and the Legislature regarding the *appropriate level of formaldehyde vapors in new mobilehomes,* on or before June 15, 1983." (Our italics.) While sections 18615 and 18616 were being considered by the Legislature, the State Department of Health Services reported to the legislative bill's author that: "Health effects of airborne concentrations of formaldehyde may be attributed to both its high chemical reactivity and highly irritating properties. . . . There is considerable variability in the lowest level of formaldehyde that will cause human irritation. Various studies suggest a wide range of concentrations at which effects are reported (between 0.05—31.7 ppm). This variability may be explained by the fact that some individuals are sensitized by small doses of formaldehyde. This is a major concern because an individual may become sensitized from a continuous formaldehyde exposure of indoor air. A noticeable effect of low concentrations of formaldehyde in humans is irritation of the eyes and mucous membranes. Eye irritation is a common complaint of persons exposed to formaldehyde. At 0.05—0.5 ppm, it produces a definable sensation of eye irritation. . . . Symptoms of upper airway irritation include the feeling of a dry throat, tingling sensation of the nose and sore throat, usually associated with tearing and pain in the eye. . . . Allergic contact dermatitis caused by formaldehyde sensitivity is well recognized and a few cases of asthma associated with formaldehyde exposure have been reported. Other health effects reported from residential environments and attributed to formaldehyde exposure include: headache, nausea, drowsiness, fatigue, disturbed sleep and thirst."

A year later, in response to the directive of Health and Safety Code section 18616, the State Department of Health Services reported, among other things, to the Legislature that: "Our staff has updated the review of available information bearing on the issue. There is not a unique formaldehyde

exposure level below which there could be assurance of no adverse health effects. . . . Viewed strictly from the standpoint of health risk from formaldehyde exposure, no evidence has been educed that would justify advocating a level higher than the 0.05 parts per million (ppm) detection limit for field measurements. Accordingly, *we are not altering the recommendation made last year.*" (Our italics.)

On its appeal, Silvercrest emphasizes heavily evidence deemed favorable to itself, while generally disregarding contrary evidence. We thus become once again concerned with the so-called substantial evidence rules, which we now state.

"Evidence, to be 'substantial' must be 'of ponderable legal significance . . . reasonable in nature, credible, and of solid value.'" (*People* v. *Johnson* (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255]; *Estate of Teed* (1952) 112 Cal.App.2d 638, 644 [247 P.2d 54].) When a jury's verdict or a trial court's factual determination is attacked on the ground that there is no substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether, on the entire record, there is substantial evidence, contradicted or uncontradicted, which will support it, and when two or more inferences can reasonably be deduced from the evidence, a reviewing court is without power to substitute its deductions for those of the jury or trial court. *It is of no consequence that the jury or trial court believing other evidence, or drawing other inferences, might have reached a contrary conclusion.* (*Grainger* v. *Antoyan* (1957) 48 Cal.2d 805, 807 [313 P.2d 848]; and see *People* v. *Johnson, supra,* 26 Cal.3d 557, 576-577.)

In accordance with these rules we state the trial's evidence as it tends to support the judgment, and as it reasonably could have been, and presumably was, found true by the respective triers of fact, court and jury.

Plaintiff Gertrude Troensegaard, a widow, 82 years of age, on or about October 25, 1982, purchased a mobilehome manufactured by defendant Silvercrest Industries. The purchase was attended by Silvercrest's express warranty that it was "free from any substantial defects in materials or workmanship" as required by Health and Safety Code section 1797.3. The mobilehome, in substantial part, had been constructed of plywood and particle board. Such components were bonded together in accordance with trade practice with a urea-formaldehyde resin which emitted varying degrees of formaldehyde fumes into the surrounding air. "There's a direct correlation between the [amount of] formaldehyde which goes into the board and that which comes off the board [in fumes]." Soon after moving into the mobilehome, plaintiff noticed an unpleasant odor therein. She began to feel "very

sick," and she developed headaches, eye, nose and throat irritation. She complained of her symptoms to the mobilehome's retailer who, at the trial, testified that after being in the mobilehome 20 or 30 minutes, she noticed the odor and also developed "headaches and nausea." The retailer wrote to Silvercrest's sales manager about the situation; he did not respond. Plaintiff then wrote to the president of Silvercrest about the matter "within one year of the date of delivery of the mobilehome," thus giving the notice required by Civil Code section 1797.3, subdivision (b); Silvercrest's president did not reply.

Instead, Silvercrest employed a qualified and respected engineering company to survey or "test" the mobilehome; it reported: "The results . . . show an airborne concentration of formaldehyde of 0.49 ppm in the dining room and 0.51 ppm in the rear bedroom. In the case of formaldehyde, [American Society of Heating, Refrigeration and Air Conditioning Engineers] recommends a limit of 0.1 ppm for non-occupational exposure. . . . Symptoms of airborne formaldehyde exposure may include irritation of the eyes and mucous membranes and difficulty in breathing. Eye irritation may occur at concentrations as low as 0.01 to 0.05 ppm. Upper airway irritation can occur at concentrations as low as 0.1 ppm. The source of formaldehyde in this case could be one or more construction materials used in mobile-homes. Materials such as particle board, plywood, and paneling are common sources of formaldehyde. . . . Formaldehyde was found to be present above the levels recommended for nonoccupational, indoor air exposure. The levels found are high enough to cause eye and airway irritation, according to current literature."

Plaintiff and the mobilehome's retailer sought to obtain the survey's results without success, *until they were ordered released much later by order of the superior court, after the action's commencement.* Officials of Silvercrest had stated that "they did not have to release that information to her. . . . She couldn't get them." And when the "tester" was asked about the survey's result "he said he was employed by Silvercrest, and he was not allowed to give her the results of the test."

Other than installing some vents and engaging in fumigation, which to its knowledge did not improve the situation, Silvercrest did nothing to correct or compensate for the defects of the mobilehome. And when plaintiff finally demanded a new mobilehome, Silvercrest Industries rejected the demand.

There was additionally much evidence of plaintiff's deteriorated physical condition, of her emotional distress, and inconvenience and attending expense. So also, was there much additional evidence that her problems were

caused by formaldehyde fumes arising from the mobilehome. And it is significant that the surveying company or "tester" employed by Silvercrest reported such fumes at an average of *0.50* parts per million vis-à-vis the ambient air, which was about *ten times* more than the professional consensus of a safe level up to 0.05 parts per million.

We consider the several appellate contentions in the order stated, and as phrased, by Silvercrest.

■ I. *Contention:* "Respondent did not meet her burden of proof on proximate cause when she failed to introduce any evidence connecting the formaldehyde vapor in her home to her claimed injuries."

The contention seems frivolous.

A doctor opined that "something in her mobilehome, most likely formaldehyde, was causing her . . . symptoms." Another said: "It's my professional opinion that the fumes in her mobilehome were responsible for her bronchial sensitivity." Yet another testified: "I felt that she had environmentally induced asthma, meaning something in her mobilehome caused her lung function to deteriorate."

The mobilehome's unpleasant and unusual odor was perceived by several other witnesses, some of whom as a result experienced symptoms similar to those of plaintiff. A "certified industrial hygienist" with a master's degree in public health, who was familiar with formaldehyde fume poisoning testified that it caused symptoms similar to those suffered by plaintiff and that: "In general, in my opinion, *a tenth of a part per million* and above is what I consider excessive. . . . So that any level of formaldehyde above [that] number . . . I . . . would consider to be excessive—. . . and a health hazard." (Our italics.) And it will be remembered that it was Silvercrest's expert who found an average of *five tenths of a part per million* of formaldehyde fumes in the mobilehome.

A related argument under this contention is that "the trial court erroneously admitted improper non-random statistical data." A witness testified that he had supervised the investigation of many complaints "as to probable causation of certain physical problems" of mobilehomes. He admitted that the investigations were *not random,* but were only made in cases where complaints were made. The mobilehomes were tested "only for formaldehyde vapors and, occasionally, asbestos in the drinking water." And he testified adversely to Silvercrest in respect of his formaldehyde fumes findings. Silvercrest's contention was that all mobilehomes have some degree of formaldehyde fumes which are usually harmless. Some witnesses agreed

that formaldehyde fumes are to be found in practically all mobile and other homes, but usually in far lesser proportions to the surrounding air than occurred here. But since the witness conceded that his investigations were *not* random, the jury were not misled, and presumably gave the witness' statistics the probative value to which they were entitled.

II. *Contention:* "An award of punitive damages in this case was improper since 1) there was insufficient evidence to show willful wrongdoing; 2) any alleged willful wrongdoing by the appellant did not cause any harm to respondent; and 3) the imposition of common law punitive damages in addition to the statutory civil penalties constitutes double punishment and is thus violative of due process."

■ " 'In order to justify an award of exemplary damages, the defendant must be guilty of oppression, fraud or malice. . . . He must act with the intent to vex, injure, or annoy, or with a conscious disregard of the plaintiff's rights. . . .' " (*Neal* v. *Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 922 [148 Cal.Rptr. 389, 582 P.2d 980]; Civ. Code, § 3294.)

We are of the opinion that Silvercrest's intentional concealment from plaintiff of the high level of formaldehyde fumes found in the mobilehome, and its failure substantially to comply with its express warranty by taking appropriate corrective action or otherwise making Mrs. Troensegaard whole, was reasonably found by the jury to constitute "oppression, fraud, or malice" with a "conscious disregard of the plaintiff's rights." And surely, such conduct causing illness and other problems of plaintiff, and an inability to use the mobilehome she had paid for, might reasonably have been found causitive of harm to her. A punitive damage award was thus proper.

■ At this point we consider Silvercrest's complaint of the "civil penalty" award of $90,000 under Civil Code section 1794. As pointed out, subdivision (c) of that code section permits such a "civil penalty" when a breach of warranty is "*willful.*" The issue here is accordingly, whether substantial evidence of such willfulness was adduced at the trial. Surely, Silvercrest's refusal, after notice of the mobilehome's defective condition, to make Mrs. Troensegaard whole, and its concealment of the report of such condition, was substantial evidence of such "willfulness."

But, as noted, the jury returned not only an award of $55,000 in *punitive damages,* but also the "*civil penalty*" of $90,000. Each of the awards was based upon substantially the same conduct of Silvercrest. And both were made for the purpose of punishing, and making an example of, Silvercrest; in their effect *both* constituted punitive damage awards. "[It is] clear that a

treble damages award is punitive in nature, imposed as punishment against a defendant, rather than compensation to the plaintiff." (*Circle Oaks Sales Co.* v. *Smith* (1971) 16 Cal.App.3d 682, 684-685 [94 Cal.Rptr. 232].)

Silvercrest argues that: "Appellant is being punished twice for the same conduct. The purpose of punitive damages is to sting, not kill, a defendant. Punitive damages should not be permitted to bankrupt a defendant. A defendant has a due process right to be protected against multiple punishment for the same act because overlapping damage awards violate the sense of fundamental fairness which lies at the heart of constitutional due process."

Punitive damages impose a penalty and thus a *forfeiture.* " 'Forfeiture' imports 'a penalty' . . ., 'a requirement to pay the sum mentioned as a mulct for a default or wrong.' " (*County of San Diego* v. *Milotz* (1956) 46 Cal.2d 761, 766 [300 P.2d 1].) "The law traditionally disfavors forfeitures and statutes imposing them are to be strictly construed." (*People* v. *United Bonding Ins. Co.* (1971) 5 Cal.3d 898, 906 [98 Cal.Rptr. 57, 489 P.2d 1385].) And although in a proper case punitive damages, or forfeitures, may be levied: "The presumption is very strong against forfeiture, and against such construction of any law as would work a forfeiture. The language of an act, to have such effect, must be very plain, or the court will, if possible, give a construction to it that would not have that effect." (*Argonaut Min. Co.* v. *Kennedy etc. Co.* (1900) 131 Cal. 15, 26 [63 P. 148].) Punitive damages "are not a favorite of the law and the granting of them should be done with the greatest of caution." (*Gombos* v. *Ashe* (1958) 158 Cal.App.2d 517, 526 [322 P.2d 933], questioned on other grounds, *Taylor* v. *Superior Court* (1979) 24 Cal.3d 890, 900 [157 Cal.Rptr. 693, 598 P.2d 854].) And "a plaintiff is never entitled as a matter of right to exemplary damages." (*Brewer* v. *Second Baptist Church* (1948) 32 Cal.2d 791, 800 [197 P.2d 713].)

And we note a holding of a United States District Court that: "A defendant has a due process right to be protected against unlimited multiple punishment for the same act. A defendant in a civil action has a right to be protected against double recoveries not because they violate 'double jeopardy' but simply because overlapping damage awards violate that sense of 'fundamental fairness' which lies at the heart of constitutional due process." (*In re No. Dist. of Cal. "Dalkon Shield" IUD Products* (N.D.Cal.1981) 526 F.Supp. 887, 899 (vacated on other grounds in *Abed* v. *A. H. Robins Co.* (9th Cir. 1982) 693 F.2d 847).) And see *Atlantic Purchasers, Inc.* v. *Aircraft Sales, Inc.* (4th Cir. 1983) 705 F.2d 712, 717, fn. 4, holding: "The two remedies are overlapping and, therefore, probably inconsistent. . . . *See generally In re 'Dalkon Shield' Litigation,* [*supra,*] 526 F.Supp. 887,

899 (N.D.Cal.1981) ('overlapping damage awards violate that sense of "fundamental fairness" which lies at the heart of constitutional due process.').''

We are of the opinion that had the Legislature, by Civil Code sections 3294 (permitting *punitive damages*) and 1794 (permitting a *civil penalty*), intended a double recovery of punitive and penal damages for the same willful, oppressive, malicious, and oppressive acts, it would in some appropriate manner have said so. And we believe that by seeking a "civil penalty" and also attorney's fees and all reasonable expenses ·as allowed by Civil Code section 1794, plaintiff had in effect elected to waive punitive damages under section 3294.

The judgment's punitive damage award must accordingly be stricken.

Under the last above-noted contention Silvercrest, without argument, citation of authority or record reference establishing that the points were made below (see rule 15(a), Cal. Rules of Court, *Estate of Gidney* (1937) 10 Cal.2d 138, 142 [73 P.2d 1186]; 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 425, p. 4391), or claim of reversible error, asserts that Civil Code section 1794, subdivision (d), allowing plaintiff costs, is unconstitutional, and that the action "was primarily a common law tort action in which attorney fees are not allowed." We treat the points as waived, or meritless, and pass them without further consideration. (See 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal § 425, pp. 4391-4393.)

III. *Contention:* "The court committed error in the instruction of the jury."

Three such errant instructions are complained of.

█ It is first argued that: "The court erred in instructing the jury that compliance with government standards is not a defense." We need not respond to the merits of the argument for, assuming the claimed error arguendo, it was manifestly harmless. For we observe no evidence of a "government standard" permitting emission of formaldehyde fumes of the degree here established by uncontroverted evidence. "Anyone who seeks on appeal to predicate a reversal . . . on error must show that it was prejudicial. (Cal. Const., art VI, § 13.)" (*People* v. *Archerd* (1970) 3 Cal.3d 615, 643 [91 Cal.Rptr. 397, 477 P.2d 421].)

█ Another argument under the instant contention is that: "The instructions pursuant to the Civil Code and the Commercial Code were improper since, as a matter of law, the respondent waived her right to rescind the sales contract by her continued use of the mobile home." It is insisted that the instructions were improper because plaintiff "had accepted the mobile

home." Plaintiff had given notice of rescission and had demanded of Silvercrest another mobilehome without defects, a demand which was unrequited.

The remaining assignment of instructional error is that: "The court improperly instructed the jury that it was required to award to respondent damages for injury to person and/or property which was a proximate result from the breach of the warranty."

The criticized instruction stated: "If you find that within one year from the date of sale the subject mobile home had a substantial defect and that respondent notified appellant Silvercrest of the defect, and that appellant Silvercrest failed to repair or replace or refund the purchase price, then you must award to respondent damages for injury to person and/or property proximately resulting from the breach of warranty."

The argument here again is that plaintiff had accepted the mobilehome for which, as noted, we find no record support.

■ IV. *Contention:* "Appellant was prejudiced by respondent's improper questioning of witnesses, respondent's improper comments during closing arguments, and by the erroneous rulings of the trial court."

The claimed improper conduct of plaintiff's attorney consisted of (1) "arguing facts not in evidence," (2) asking "improper questions," (3) "improper rebuttal" and (4) argument appealing "to the passions of the jurors."

As to the first three assignments no record reference whatever is made. We therefore do not consider them. (See rule 15(a), Cal. Rules of Court; *Harbor Ins. Co.* v. *Resolute Ins. Co.* (1972) 23 Cal.App.3d 190, 197 [99 Cal.Rptr. 916]; *Fox* v. *Erickson* (1950) 99 Cal.App.2d 740, 742 [222 P.2d 452].) As to the fourth, some of Silvercrest's objections were sustained and some were not. As to none of them was request for an appropriate jury admonition made, as is required by law in order to obtain relief on appeal. (See *People* v. *Green* (1980) 27 Cal.3d 1, 27-36 [164 Cal.Rptr. 1, 609 P.2d 468].) And in our opinion, had such admonitions been requested and given any conceivable prejudice would have vanished.

Another assignment of error under the instant contention relates to defense counsel's persistent objections during plaintiff's attorney's jury argument. The following occurred:

"Mr. Manoukian [Silvercrest's attorney]: Objection, your Honor. There is no evidence of that at all. The Court: The objection is overruled. The

jury is going to decide what the evidence is here. I would suggest to you that you stop objecting, if you're objecting with regard to what the evidence was. The jury is going to decide that. And I'm going to overrule your objection every single time here. So if you have a legal basis for an objection, use it. If not, I would suggest that you're not getting anywhere, and you're just wasting everybody's time. Mr. Manoukian: Under the case of Sabella (phon.) versus Southern Pacific, I have to make objections. I can't sit here—The Court: You're incorrect on that. If you want to keep on objecting, go ahead."

We note that no contention of error is made as to the trial court's rulings on the many previous objections of Silvercrest's attorney. Nor do we otherwise observe any related error.

The judgment will be modified by striking the $55,000 punitive damage award and by giving defendant Silvercrest Industries, Inc., credit for the $6,000 paid by other defendants. As so modified, the judgment is affirmed. The parties will stand their respective costs of the appeal.

Holmdahl, J., concurred.

**RACANELLI, P. J.,** Concurring and Dissenting.—I concur in the majority opinion except as to that part concerning the implied waiver and rejection of the punitive damages award. As the majority correctly point out, defendant's wilful breach of warranty in failing to repair or replace the defective mobile home justified imposition of a civil penalty not to exceed "two times the amount of actual damages. . . ." (Civ. Code, § 1794, subd. (c).) The penalty assessed was, of course, well within allowable limits. However, the punitive damages award was based not on the same conduct evidencing wilful noncompliance but on the separate and distinct theory of fraudulent concealment of the unfavorable EAL report; and the jury so specially found. That special finding, adequately supported by the evidence, independently justified an award of punitive damages under Civil Code section 3294. Each award rests on a separate factual basis and legal theory involving more than a single kind of actionable conduct entitled to be redressed in damages. Indeed, the Legislature obviously recognized such possibility in expressly providing that the remedies under the Song-Beverly Consumer Warranty Act "are cumulative . . . [to] any remedy that is otherwise available, . . ." (Civ. Code, § 1790.4.)

Thus, the jury acted well within its authority in awarding exemplary damages both to punish and to deter such egregious fraudulent conduct. The fact that the cumulative monetary remedies consist of punitive damages (which, in the aggregate, are less than the maximum allowable civil penalty

under the Act) should not be perceived guilelessly as an impermissible forfeiture and resort to a fiction of waiver. There is simply no basis to warrant a determination of waiver in the conventional sense. (See generally *City of Ukiah* v. *Fones* (1966) 64 Cal.2d 104, 107-108 [48 Cal.Rptr. 865, 410 P.2d 369].) Indeed, waiver of *any* of the provisions of the Act dealing with consumer and mobilehome warranties is expressly prohibited as a matter of public policy. (See Civ. Code, §§ 1790.1, 1797.4.)

I would affirm the judgment in all respects offset by the $6,000 settlement received by plaintiff.

A petition for a rehearing was denied January 3, 1986.